ARTHUR TALLEY v. HELEN DALTON, By Next Friend, OSCAR M. DALTON.

Eastern Section. July 14, 1928.

Petition for Certiorari denied by Supreme Court, December 8, 1928.

598

Geo. W. Gorrell, W. O. Mims, of Newport, for plaintiff in error.
Greer & Greer, of Newport, for defendant in error.

SNODGRASS, J. This is an action for damages for personal injuries resulting to Helen Dalton, a minor, in an automobile collision. She was riding at the time, sitting on the lap of her mother on the front seat of an automobile that was being driven by her father, Oscar M. Dalton, the next friend. It was in the late afternoon of September 12, 1925, and they were on the Oven Pike road leading northward from the town of Parrotsville, Cocke county. The collision was with the car of Arthur Talley, which at the time was being driven by him southward in the direction of his home beyond Parrotsville. It occurred just over the top of the hill near the residence of a Mr. Radcliff, which was situated on the left of the pike, going northward. There was a garage situated on the right of the pike seemingly opposite the Radcliff residence, or somewhere nearly so. The Dalton car was proceeding under control toward the top of the hill, behind a car being driven by two girls by the name of Carlisle, who were intending to stop at the Radcliff residence, and it seems that just about the time these girls were intending to drive into the garage entrance on the right the Dalton car sought to pass

them by driving around them to the left, but on seeing the sign that they were intending to drive in the Dalton car stopped somewhere near the center, but somewhat to the left, while the Carlisle car made its turn to the left preparatory to leaving the road on the right, and, as opportunity offered, the Dalton car started up again with the object of passing, which it did. In passing the attention of both the driver of the car and the plaintiff (the daughter) was momentarily attracted by the salutation that was made to or by the occupants of the Carlisle car, and thus momentarily they were both slightly looking back or having their attention disengaged from the front. Mr. Dalton's account of it was as follows:

"I was fooling along behind them slow, and when they came there they wanted to stop—there was a parked car there, and she held out her hand to turn in there and I stopped until she turned in, and when she turned in I started on and I was still in low, and I changed gear, and when I passed there they looked around and I spoke to them that way (indicating) and when I looked back this way I seen Mr. Talley coming in his car, and he was coming at full speed, looked like he was bobbing up and down, and I pulled over to my right side and stopped, and when I got on the side he came right on and pulled in and turned in and hit my front wheel, lefthand wheel, hit the front wheel, and broke my headlight, bent up the left fender, bent the axle and radius rod and tore down my right front wheel next to the bank. The tire came off of it when he hit it and the door flew open on the right side, and that girl was pitched out head foremost. She first pitched to the front and her head hit something there and raised a great big blue mark, and then she bounced back and pitched out to the front and lit on her face."

He testified that he had his car under control; that he had his foot on the lefthand pedal, driving in low; that he had not had time to change; when he saw there was no use of it, that he turned into the bank as quick as he made the turn off the road to his right hand as far as he could.

The plaintiff minor testified to the immediate facts of the collision as follows:

"I was sitting on my mother's lap and looked back at a car we passed, and I heard my mother say 'my God,' and I looked to see what was wrong, and that is the last I know about what happened."

The declaration, to which there was a plea of not guilty, set forth the cause of action to be, that on account of the negligent, careless and illegal operation of his automobile the said defendant Arthur Talley did injure the plaintiff, by breaking her ribs, crippling her in the hip, bruising her about the head and body, and in other re-

spects greatly hurt, bruised, wounded and put in great peril, and rendered her sick, sore, lame and disabled for a long space of time, to-wit, from that day until the commencement of this suit; during all of which time it was averred plaintiff suffered great pain and mental anguish, and was thereby obliged to and did necessarily spend and have spent a large sum of money, etc., was permanently injured and her capacity for work, labor, business, enjoyment of life and ability to attend school was greatly and permanently impaired, for which she sued, and laid the damages in the sum of $5000.

There was a trial before the judge and jury at the September term, 1927, the trial taking place about November 1st, when the jury returned a special verdict in favor of the plaintiff, a part of which is as follows:

"Upon their oaths do say that they find the issues involved in favor of the plaintiff, and fixed the sum of her recovery at the sum of $1250 damages, and the sum of $250 expenses."

There was a motion for a new trial, which was overruled upon the accepted condition that plaintiff remit $250, and judgment was entered in her favor in the sum of $1250, from which the defendant appealed and, as plaintiff in error, has made numerous assignments of error. For convenience the parties will be referred to as the cause was styled below.

It is proper to state also that there was an overruled motion in arrest of judgment. Also that an original attachment had been sued out and levied, to which there was filed a plea in abatement. This plea never seems to have been traversed or further notice taken thereof to make any disposition of the same. The defendant having gone to trial upon his plea of not guilty without having his plea passed upon, must be taken as having abandoned the same; and, if the judgment is supported, it would likewise follow that the property attached was properly directed to be sold and judgment rendered on the forthcoming bond for the debt in lieu of its return to the officer.

The foregoing has the effect of overruling the 11th assignment, covering alleged error in pronouncing judgment on the replevin bond.

There are twelve assignments of error, the last one being that the court should have arrested the judgment because it was insisted the verdict was void, and to the same effect are the 4th and 5th assignments. The 4th assignment insists it is void for the reason the jury reported two sums of recovery, either of which it is claimed would be a complete satisfaction of the wrongs and injuries sued for.

The 5th assignment insists it is void because the jury reported $250 as expenses, when in fact there was no proof as to expenses at all. And in the 5th assignment error was predicated as to the charge.

We do not think the verdict was void simply because the jury re-

turned a special verdict separating the expenses from the other item
of damages, and if there was any error as to the expenses by reason
of specific proof as to the amount, it was cured by the court in
eliminating $250 from the verdict on the motion for a new trial, and
it would thus appear that the defendant suffered no injury in rela-
tion thereto.

The reference in the charge to the plaintiff as "deceased" should
be regarded merely as a clerical error.

These considerations overrule the 12th assignment as well.

Regarding the 6th assignment, we think there was sufficient evi-
dence before the court to enable the jury to fairly estimate and award
the damages given, notwithstanding there may have been no direct
evidence of any money lost or any other actual valuation of the earn-
ing capacity, either present or prospective, of the plaintiff. The
fact of the injury, the age and previous health of the plaintiff, the
extent of the injury and its effects were all before them. It was
their province to themselves estimate and assess the damages from
the facts before them, and their discretion will not be reviewed ex-
cept it be abused or exercised unreasonably, which does not appear
to have been done in this instance.

Nor do we think the excerpt from the charge covered by the 7th
assignment was error. People do have the right, within the speed
limits, to pass others going in the same direction, and under such
circumstances it is their duty to pass on the left. We think the
proof fairly called for the paragraph complained of, which is as
follows:

"It is also the duty of a person operating an automobile un-
dertaking to pass another going in the same direction, to pass
on the lefthand side of the car he desires to pass."

Plaintiff was entitled to have this statement submitted to the jury,
if the proof fairly made it inferable, as an excuse for being on what
would ordinarily have been the wrong side of the road, but which,
for the purpose indicated, might lawfully and without negligence
per se be occupied. However, the one so employing it could not
unreasonably continue to do so to the inconvenience or safety of those
entitled to it as their ordinary right-of-way, and it would be one's
duty, on seeing another approaching who held the title, to vacate
it as soon as it could reasonably be done. On the other hand, as
passing is well known to be the ordinary exigency of travel, it is the
duty of all travelers to anticipate and keep a lookout for those who
might be thus authorized to temporarily obstruct their passage, and
to have their means of locomotion under such control as to enable
the observance of the law of the road, and likewise to anticipate that
it will be observed. The negligence predicated here is, that notwith-
standing plaintiff had thus used a part at least of the defendant's
right-of-way in attempting to pass the Carlisle car, and notwith-

standing the driver may have had his attention temporarily diverted, that he looked back in time to discover and discharge his duty, which he was even pursuing while his attention was diverted, and that at all times there was room for the defendant to have passed on his own side; but that in violation of the law of the road the defendant had assumed to pass him on defendant's left side, without necessity, or without any sudden emergency of peril that might have justified erroneous judgment. We think the proof justifies this insistence, and that there is proof to support the verdict.

The 8th assignment is that the court was in error in refusing to give the following special request in charge to the jury:

"You are instructed that the plaintiff, Helen Dalton, was required to exercise such care and diligence as a prudent person would use in driving a car, and it was her duty to be on the lookout and warn the driver of the car of danger, and to use such care and diligence as a prudent person would use to prevent the accident."

This special request had two inaccuracies, we think, that were sufficient to authorize its rejection. In the first place she was a guest, and the same diligence was not on her as was on the driver. As a guest she was under the requirement to observe only that degree of care that an ordinarily prudent person (not a prudent person) would observe under the circumstances to look out for her own safety. The words "prudent" and "ordinarily prudent" are not synonimous terms. The one is the modification of the other. Besides, notwithstanding the guest may be looking back, if the driver in fact had his attention to the front, in time, as the proof indicates, that no injury occurred by reason of the momentary diversion as a proximate cause, it is unimportant as to what the guest was doing, if the driver as a matter of fact was doing his duty and was not negligent.

Nor was the court in error in refusing the special request covered by the 8th assignment of error we think. In so far as the proof formed any basis for the request, it was covered sufficiently in the general charge. The proof we think did not present any case of mutual negligence. Upon the matter intended to be covered by the request, or as authorized to be so covered, the court said to the jury:

"If you find from the preponderance of all the evidence that the plaintiff Helen Dalton failed to exercise ordinary care as already defined for her own protection, and that such failure contributed in any degree as a direct and proximate cause of her own injury, then he (she?) cannot recover in this suit, and your verdict must be for the defendant."

The 10th assignment is that the verdict is so excessive as to evince prejudice and passion on the part of the jury.

We think this assignment is not well taken. Mr. Dalton in further describing what occurred after the plaintiff was thrown out of the car, said:

"I jumped out as quick as I could and got around to her, and she was screaming and lying there, lying on her face there, and I picked her up, and when I picked her up she quit screaming and she hushed, and she was just lifeless, and Mr. Talley was behind me, and he was there at this time, and the two ladies that I was speaking about, they were there; and we picked her up and we laid her down on the porch, and I got a doctor as quick as I could get him there, and she just remained lifeless, laying on the front porch until he came; and when he came he got her in the car, and he sat on one side and I sat over there, and she laid across my lap." He testified that she never spoke a word from then until 8:30 the next morning; that she commenced having hemorrhages of the head and bled from her nose, ears and mouth, and that it kept up that way for four months, and then got all right; that when she would go to having them spells her tongue would fly back in her mouth and she could not speak, and that they could not give her a bit of medicine—that they would have to take a spoon and press her tongue down in her mouth, down from the roof of her mouth, and give her medicine; and when she would take these spells she would begin to scream—and then she would only speak for a moment and they would grab her all at one time, and that they would always know the day before when she would take these spells; that she had never suffered thus before the accident occurred; that she had continued to suffer with her head and that trouble until now; which, being interpreted, was until the day of the trial, or, in other words, some two years. He said that her head was rarely every easy; that she had not been able to go to school; that she went one week the last year, but had to quit, and that that was the only reason for it; that she could not study, she suffered with her head all the time.

The plaintiff herself testified the pain was in the back part of her head, on the left side, where she suffered. She said:

"I never get rid of that—I suffered with it always." She said that before the accident she probably would have a little headache, but hardly any; nothing to compare with what she had now; that she was not able to perform any household work around the house; that she had not been able to attend school since the wreck; that she began at the first term, but could not go; that the reason was she could not study and sit still but a few minutes at a time; that she got so nervous her head ached, and she could not stand to sit; that she took up the first year

high, but was not able to go any further on account of the accident; and she testified that she was now suffering.

To the same effect was the testimony of her mother.

Dr. L. S. Neas was called, and he testified that:

"The biggest thing I had to treat when I first arrived was the shock. She was very cold and clammy, and shallow breath, and I let her rest for a little while, and then I took her on home about four miles, I guess to her home, and got her to bed, and used hot water bottles to get the body temperature up, and I wanted to get her stimulated. She was absolutely unconscious all that night, and until the next day, as well as I remember, about the middle of the day." He testified that this resulted from the accident; that the injury was quite painful; quite a bit at times; that there would be a possible chance of trouble later for that matter; that he did not think she was able to attend school from the condition she was in; that she also had a fractured rib.

Doctor E. E. Northcutt, who operates the Northcutt Hospital in Newport, holding a degree from Vanderbilt and having practiced medicine twenty-three years, made an examination of the plaintiff the first of the year and testified, though not a complete examination until afterwards, that she was suffering with a condition of her nervous system and that her brain had a great deal of pain on pressure, and gave evidence of having concussion of the brain, which were the findings he said that caused him to reach that diagnosis. Asked if he was able to say whether or not the injury he found was permanent or temporary, he said: "Well, that is a hard question, but I would say that she does have a slight permanent injury."

"Q. Would that affect her attending school or studying or doing hard work? A. Yes, I think it would; I don't think she has the strength physically, or the nervous strength to do a great deal; she may improve, however, some." He testified that he had her under observation two months; that he had treated her he thought about two months; that she had some pelvic trouble; some of her pelvic organs were drawn entirely by adhesions; that she may have had that a long time, he could not say; that he would say that was due to the uterus, her uterus turning over and being in that condition, and sometimes it could be due to an injury, or could result from a fall or injury—but could not say whether that was the cause of it; that her principal trouble was in her nervous system, and this pelvic trouble, that affected her in other ways. He stated that as a part of his investigation he had made an X-ray examination, and he was asked:

"Q. Was this nervous affliction that you found her suffering with traceable to this wreck, the injury she suffered within about eighteen months previous to this examination? A. Yes, I felt it was, from my examination.

"Q. Now assuming that she was normal and had not suffered with headaches or nervousness until this wreck, would you say, based on your examination of her and your professional opinion, that it was traceable, the condition you found her in due to that wreck? A. Yes."

On cross-examination and re-examination he testified as follows:

"Cross-examination: Q. You observed her for two months? A. Yes, I think so. Q. She came to you for that purpose? A. Yes, and I treated her. Q. She had some uterine trouble? A. Yes. Q. That produces nervousness? A. Oh, yes, that is true. Q. And that is a condition that is prevalent in a great many females, especially a girl of her type? A. Yes, affliction of the uterus causes nervousness. Q. She is in fact a neurotic? A. Yes. Q. And her father also? A. Yes, I think he is. Q. How much of this nervousness she gets by heredity and how much she gets from that injury it is hard to say? A. Yes. Q. You could not unscramble it, doctor? A. No. Q. Anyway you didn't find any fracture of the skull? A. Yes, I took a picture—she had a slight fracture or crack in the bone of her head—she had some lesion of the gremator. Q. You don't know what caused that? A. No. Q. And she got better from your treatment? A. She improved some, yes sir. Q. So she could go to work? A. Well, I don't know—I recommended that she not work she improved some. Q. Did she quit your treatment? A. Well, I felt I had done all the good I could unless I could operate on her for a pelvic operation—so far as the head was concerned, I felt that I had done her all the good I could, and in time that perhaps it would be eliminated. Q. In other words, time corrects those things? A. Yes, it does to some extent. Q. You believed she needed a uterine operation? A. Yes—I recommended no operation for the head."

"Re-direct examination: Q. I will ask you in your professional opinion as a physician whether or not a neurotic person would suffer more from a wreck than a person who was not suffering from nervous trouble? A. I think that would be so."

This evidence needs no comment, and is a sufficient refutation of the assignment that the verdict is so excessive as to indicate prejudice or passion. We think the defendant, whom the evidence indicates is one of those fast drivers who would rather take a chance than slacken his speed, has escaped well, and is not justified in making any complaint as to the size of the verdict.

There is evidence to support the verdict, and there is no merit in the first assignment that there is none.

The other two assignments to the effect that the undisputed evidence or facts established contributory proximate negligence on the part of the plaintiff barring a recovery are not supported. The jury has passed upon these questions and their verdict, which has evidence to support it, is to the contrary; and if it lacked any actual appearing support, it would be supplied in the presumption as to its sufficiency that would inhere from the character of evidence introduced before them, which is not before us, notwithstanding the certificate to the bill of exceptions recites that it contains all the evidence in the cause. For instance, in the examination of Mr. Dalton, the following appears:

"Q. Now I have made a little drawing there, Mr. Dalton, and I will ask you to take these cars, these two, and show the jury how you were driving there, and we will let that represent your little car, and this the Talley car, and show how they came in contact. A. This represents the Oven Creek road here and Mr. Talley came over and came in here—I was coming by this Radsliff house—

"Q. Now, these girls were coming along here and you were in behind them? A. Yes.

"Q. Let this represent the girl's car? A. Yes.

"Q. The Carlisle girls would be right along there? A. Yes.

"Q. And here come these girls, they were driving along something like that— A. (Interposing) The Carlisle girls were coming along there and I came something like that, and when they got out there the girls, one of the girls held her hand out and stopped and I stopped there, and the Carlisle girls turned in there, this way (indicating), and when they turned in there I passed by and I looked around at the girls—I knew who they were, and then I turned my head back and saw Mr. Talley coming something like that (indicating). I was about thirty yards from there (indicating), and when I saw him coming like that (indicating), his car was going this way (indicating) and he was running so fast when I seen him, he was running so fast and of course I thought there was danger and I took my car and turned it and went nearly to the bank there. Here is the bank (indicating), and when I got there he hit right against—he came up this way (indicating), and he hit me there and hit my front wheel there and hit my wheel there (indicating) and knocked this axle in and when he hit my wheel he knocked by front headlights out and dented my axle something like this (indicating), and this wheel went in and the radius rod was bent there, and that spindle in the wheel—he turned

in this direction, and when it hit my car this door flew open there and the little girl was sitting in her lap and she pitched to the front and hit her head and there was a great big knot on there, and when she hit that knocked her back and she went out the door on her face.''

The same was characteristic of Mrs. Dalton's testimony. She was asked:

''Q. Just state, Mrs. Dalton, what he did? A. He went on the left side of the road and hit us. Q. Now here are some little cars that I have, Mrs. Dalton, and this represents Parrottsville (indicating), and this is the road right there, and there is Mr. Talley's car coming back there, and here is the Dalton car—the car you were running coming in this direction, and the Carlisle girls were in a car going in front of you—just take these two cars and show how they came together or about where they were—your car coming back there (indicating)? A. Yes. Q. And this car was coming up there (indicating)? A. Yes. Q. Just indicate by taking these two cars and show the condition they were in after they were struck, the way they travelled up there and the way they came. A. Well, like that. Q. Just take them and put them there. A. Like that (indicating),—there is the Dalton car there. Q. You say it was coming—just bring the car there like it was coming, Mrs. Dalton. A. Well, it was being driven, the car— Q. (Interposing) Just run it like it was there. A. Yes (indicating). Q. That was your husband there? A. Yes, he was in low, and he never changed gears there. Q. Take the other car and place it back there please, where you saw,—the same distance back, put it back when you first saw it, to represent the point you first saw it? A. I saw the car farther than any of them I think, saw it coming, and it came about like that (indicating). Q. Was there room at all times for this Talley car to have passed the right hand side of your husband? A. Yes. Q. There was no reason for them coming together there? No, not that I could see.''

It is manifest from this testimony that the jury had before it ocular illustrations which do not appear to us from the bill of exceptions, and that they were of such a character as to enable the jury to well determine from them, being evidence that is not before us, the responsibility for the accident.

If the parties are content to try their cases upon evidence of this character, and under the circumstances of this case, without preserving any key or photograph as to what the jury were looking at in the demonstrations that were being made to them which so

608

materially affected the questions at issue, it is a vain thing to say in the certificate that "this contains all the evidence in the cause."

Upon the whole we find no reversible error in the record, and the judgment of the lower court is affirmed, with costs against appellant and his securities.

Portrum and Thompson, JJ., concur.