YELLOW CAB COMPANY v. JOHN L. JELKS.

Western Section. December 10, 1928.

Petition for Certiorari denied by Supreme Court, March 10, 1929.

Wilson, Gates & Armstrong and Kyser & Allen, of Memphis, for plaintiff in error.

Canada, Williams & Russell, of Memphis, for defendant in error.

OWEN, J. The parties will be designated for convenience, as plaintiff and defendant. Dr. John L. Jelks was the plaintiff below, he recovered a judgment for $10,000 for personal injuries against the defendant, Yellow Cab Company, a corporation, the declaration contained five counts and they were based on common-law statute and certain city ordinances. It was alleged that a cab operated by one of the defendant's employees, negligently struck the plaintiff at or near the intersection of Monroe avenue and Front street, in the City of Memphis, about eleven p. m., April 23, 1927. It was alleged that the plaintiff was crossing from the east side of Front street to the west side when he was struck. The said taxicab was being operated in excess of thirty miles an hour and that the operator of said taxicab was driving the same recklessly, wilfully, wantonly and criminally. It was also alleged that the driver of said cab was not on the lookout for pedestrians and that he did not have said taxicab under control. The defendant filed a plea of not guilty, a plea of contributory negligence and also plead a city ordinance in bar of plaintiff's recovery in which ordinance is as follows:

"No pedestrian shall cross any street except at a street intersection and no pedestrian crossing any street intersection shall cross diagonally, but shall use only such crossings for pedestrians as are designated by lines or other marks or if no lines or marks, shall cross only in the space between curb lines extended and the property lines extending across any street over which said pedestrian intended to pass."

At the conclusion of all the testimony the defendant made a motion for a directed verdict which was overruled. During the argument of the attorney for the plaintiff and while he was discussing the fee that an expert witness stated Dr. Leroy for the defendant would charge the witness, having said that he had not fixed his fee. It appears that one of the jurors responded from the jury box "it will be enough," Colonel Canada for the plaintiff replied, "yes I think so Mr. Juror," on this statement of the juror from the jury box the defendant asked for a mistrial which was overruled. After the verdict was returned the defendant seasonably filed a motion for a new trial containing numerous grounds, which motion was overruled. The defendant excepted, prayed and was granted an appeal and has assigned seventeen errors. These errors are briefly

discussed in groups, the first is, there is no evidence to support the verdict. The second is, the court erred in overruling a motion for a directed verdict. The sixteenth and seventeenth assignments complain of the verdict being excessive.

Group No. 2 embraces assignments three and four, which complain of the court's charge. Assignments five, six, seven, eight, nine, ten and eleven complain of the court's refusing special requests offered by the defendant. Group No. 3, which includes assignments twelve and thirteen complain of the admission of certain evidence offered by the witness, Dr. Eustice Semmes. The fourteenth assignment complains of the court not granting a mistrial on account of the response of the juror during the argument of counsel which we have heretofore referred to. The fifteenth assignment complains of certain misconduct of the jurors, it being insisted that the jury or certain jurors during their deliberation discussed the existence of liability insurance carried by the defendant. As to the facts we will state briefly a few of the controlling facts as shown by the record. Dr. Jelks is a well known surgeon and medical writer. On April 23, 1927 and about eleven o'clock, p. m., the plaintiff was leaving the Palace Theater on Union avenue in the City of Memphis. He went from Union avenue west to Front street. He turned north on Front street, being on the west side thereof, and went to Monroe avenue one block north of Union. His auto was parked west of Front street and south of Monroe. While he was crossing Front street from east to west at its intersection with Monroe avenue, he was struck by a Yellow Cab driven by an employee of the defendant. There is proof tending to show that the cab was going at the rate of thirty-five or forty miles per hour. Dr. Jelks testified as follows:

Dr. Jelks testified that when, in about the middle of the street, crossing from east to west and standing still,

"About that time I looked up and saw a car approaching at a terrific rate of speed, which caused me to think it was a riot car, and as the man approached getting about the center of Monroe or between the center of Monroe and the north line of Monroe, the car seemed to swerve toward my friend who was approaching the sidewalk, whereupon I hollered 'look out Ed' and when I did that Ed jumped toward the sidewalk, at or toward it. . . . Instantly, however, the car which had swerved toward him now turned at almost right angles at me because it had to do this in order to strike me and because he was running at such a terrific speed and swerved his car very suddenly around, I thought the man was really trying to turn completely into this street (Monroe avenue)."

Jack Sossaman, who was near the scene of the accident when it happened, testified as follows:

"I was called out to work on a car on the west side of Front and Monroe. . . . I was working on the car and heard a crash and looked up and seen a cab hit Dr. Jelks. I got up and helped pick up Dr. Jelks, and picked up his glasses, and the cab ran about forty feet and hit the curb, and glanced from the curb and hit into a car about forty-five feet from there— about eighty-five feet after hitting Dr. Jelks. (Could the court imagine a car running wilder?)

"Q. First struck the curb you say about eighty-five feet away? A. About forty feet.

"Q. Which curb? The left hand side.

"Q. The curb on the left hand side?

"A Juror: That means the east side.

"The Witness: The east side of Front street; he was going south.

"Q. Then where was this car that was still forty-five feet or so down that he struck? A. On the side of the curb.

"Q. Same side? A. Yes, sir.

"Q. East side of the street? A. East side of the street."

Miss Gertrude Hand, a young lady who was returning from the Palace Theatre, when the accident happened, testified as follows:

"Well, the first thing, I wasn't paying any attention to the traffic, but I heard this crash and then I saw this man getting up, and they helped him up and he was holding his head, and they went and put him in the car and then we left.

"Q. What became of the car that hit him? A. It had stopped about one hundred feet or more down on the east side of the street.

"Q. Did it have any collision down there or run into anything that you remember? A. I don't remember that. I know it ran into the curb. . . .

"Q. On which side? A. East side.

"Q. That is on the left side of the driver? A. Yes, sir."

George Craig, the driver of the taxi, testified for the defendant but he practically admitted that he was going at an excessive speed and that the brakes of his car were in bad order and that he had reported to the company several hours before the accident occurred, that his brakes were not working but he received instructions to go ahead and use the car.

We find evidence to sustain the verdict of the jury and it was not error for the court to refuse a directed verdict for the defendant. We are of the opinion that the ordinance relied on by the defendant, has no application to the crossing where the plaintiff

was struck. It appears that there are no lines at the intersection of Monroe avenue and Front street, indicating where pedestrians are to walk when crossing Front street. The plaintiff was crossing at the intersection of Front street and Monroe avenue. It appears that Monroe avenue, at the intersection where plaintiff was injured, is fifty-five feet wider from curb to curb than it is east of Front street, so the reasonable travel expected of a pedestrian going north on Front street and on the east side thereof who wishes to cross to the west side of Front street, would cross upon reaching Monroe avenue as the plaintiff did. It would not be reasonable to expect the plaintiff to cross Monroe avenue from the east side of Front street to the north side of Monroe avenue and then turn west and cross Front street and if necessary, turn south, recross Monroe avenue to reach an objective point on the west side of Front street and south of Monroe. A pedestrian has the right to cross a street. A city may, with reasonableness, designate where the crossing is to be but in the instant case there was no designated lines within which the plaintiff was to walk while crossing from the east side of front street to the west side. He crossed it from curb to curb at the intersection of Monroe avenue and when within the street he had as much right to the street as the defendant's taxi.

We are of the opinion that the court erred in his instruction to the jury as to the application of the ordinance but the defendant is not prejudiced by the error. The third assignment is overruled. On the question of the amount of damages or the verdict being excessive, the plaintiff was knocked down, he received very serious bodily injuries, some of his ribs were fractured but the most serious injury was an injury to his brain and from which the plaintiff was suffering at the time of the trial, many months after the injury. Dr. Eustice Semmes, a brain specialist, testified that he had treated the plaintiff and had him under observation since the accident, that he found the plaintiff's brain swollen; he suffered with severe headaches and insomnia; that the brain would never repair itself and among other things Dr. Semmes testified as follows:

"Q. What effect does that condition have on the mentality of the patient? A. The result of these injuries to the brain, with or without fracture of the skull, is to make the patients subject to headaches,—to make them tire easily,—if he has been doing mental or physical work, so that they can't keep at it; they lose emotional control, so that they will be irritable and restless; they will cry, etc., according to their particular disposition; and, they lose what we call some of the higher functions of the brain; that is, they are not as ambitious as they were—not as determined, and they lose, in effectiveness; they

will occasionally have more serious things—epileptic fits, etc., develop a year or so afterwards.

"Q. These general conditions which you have described how long do they continue? A. For an indefinite period. They may continue throughout the remainder of life,—may get better; sometimes they get worse. It is rather difficult to judge just what is going to happen in any particular case."

There was testimony that the plaintiff had a high standing as a physician and surgeon; that his gross income was from $12,000 to $15,000 a year; that his practice has necessarily been greatly decreased on account of his physical and mental injuries. There is no fixed rule by which damages for personal injuries can be ascertained or mathematically calculated. The jury was properly instructed as to the amount to be allowed and fixed for the plaintiff if they were of the opinion that he was entitled to recover damages. The jury returned a verdict which has been approved by the trial judge and under the facts of this record, we do not think that the verdict should be disturbed.

The sixteenth and seventeenth assignments are overruled; as to the fourteenth and fifteenth assignments, on the prejudice and misconduct of the jurors, we find no evidence sustaining the contention that the jurors were influenced on the question of liability insurance; the average juror today knows that a public carrier like the defendant and bus companies, carry liability insurance. It is so commonly known that liability insurance is carried that a juror who would say that he didn't know that the defendant carried insurance would be very ignorant but there is no evidence that the jurors let this fact or knowledge influence them in any manner. As to one of the jurors giving a response to Colonel Canada's argument, the juror should not have done so but the defendant was not prejudiced by this exclamation. The fourteenth and fifteenth assignments are overruled.

As to assignments twelve and thirteen, which complain of the evidence of Dr. Semmes; Dr. Semmes was an expert, the defendant had an expert witness, Dr. Leroy, both of these witnesses had to give opinions as to the condition of the plaintiff's brain injury. We are of the opinion that Dr. Semmes qualified to answer the questions asked and that the evidence was competent. These two assignments are overruled and disallowed.

The fourth assignment is as follows:

"The Court: Gentlemen of the jury, I will leave the question of whether or not the plaintiff violated this city ordinance, as claimed by the defendant, with you. The defendant says he did. The plaintiff says at the time of the injury he did not.

This is a question of fact for you to determine. The other question is as to whether or not, if he violated it, it was the proximate cause or proximately contributed to his injuries, or only remotely contributed to his injuries, or whether it contributed at all."

This assignment is overruled because the defendant was not prejudiced by the charge of the court we have heretofore stated in disposing of assignment three. That we are of the opinion that the ordinance relied on did not apply to the facts of this case, however, the trial judge left the question to the jury as to whether or not the plaintiff violated the ordinance in crossing from the east side to the west side of Front street, therefore, the defendant cannot complain as to this part of the charge.

As to the remaining groups of assignments in regard to the special requests submitted by the defendant, it appears that the defendant submitted fifteen special requests, many of them are very long. They cover too much of the transcript to be copied in this opinion. It appears that the court granted eight of defendant's special requests which were reiterating what the court had already charged the jury but with more elaboration.

As to the seven special requests set out in assignments five to eleven inclusive. Six of these requests refer to the plaintiff violating the city ordinance relied on and the defense of contributory negligence. These were all fully covered by the court's general charge. The special request being assignment number ten, bears upon the plaintiff not producing his books to show his loss as physician and surgeon. Mrs. Brown, the plaintiff's bookkeeper, undertook to relate what the plaintiff had lost and upon motion of the defendant her testimony was excluded. The defendant did not call for the plaintiff's books during the trial. The plaintiff testified that he did know exactly what he was earning, gross or net, that he might ascertain the amount if it was necessary to figure it out.

The court was not in error in declining special request number six which is made the basis for assignment number ten.

While we have stated that the charge of the court is not without error, yet the errors did not prejudice the defendant. It does not affirmatively appear that these errors affected the verdict. Chapter 32 of the Acts of 1911 applies.

It results that all the assignments of error are overruled and disallowed. The plaintiff will recover of the defendant the amount of the judgment rendered in the lower court, with interest thereon from the date of its rendition and the costs of the cause for which execution will issue.

Heiskell and Senter, JJ., concur.