NATIONAL FUNERAL HOME et al. v. BESSIE L. DALEHITE.

Western Section. July 13, 1932.

Petition for Ceriorari denied by Supreme Court, January 21, 1933.

484

Wilson, Kyser, Armstrong & Allen, of Memphis, for plaintiff in error.

Ewing, King & King, of Memphis, for defendant in error.

OWEN, J.   The National Funeral Home and J. L. Carlisle, hereinafter referred to as defendants, have appealed from a judgment rendered against them in favor of the plaintiff below, Mrs. Bessie K. Dalehite.

The plaintiff was injured on Madison Street in Memphis, Tennessee, October 1, 1930, by an ambulance owned by the defendant National Funeral Home and driven at the time by the defendant J. L. Carlisle.

The plaintiff's declaration contained four counts. The first count was based on common-law negligence. In the other three counts, the plaintiff, in addition to her allegations of common-law negligence, alleged that the defendants had violated a certain city ordinance of the City of Memphis.   The three ordinances set out in counts two, three and four are as follows:

(1) That no motor vehicle, street car or other vehicle, however operated, shall be driven upon any street at a greater rate of speed than 25 miles per hour.

(2) That the driver of every vehicle on approaching a street car which is stopping or has stopped to take on or let off passengers shall stop such vehicle at the rear of the street car so as to allow free passage between the street car and the curb and the driver of every such vehicle shall keep his vehicle standing until the street car has resumed motion.

(3) That no person having control or charge of any motor vehicle shall allow such vehicle to pass such street car on the left.

The plaintiff also sued for compensatory and punitive damages.

It appears that on the morning of the accident, which occurred about 7:30 A. M., the plaintiff came to her work. Her employer was engaged in business on Madison Avenue, near Fourth Street in Memphis. The plaintiff alighted from a street car, known as a Fair Grounds car, when the car stopped at Fourth Street and Madison Avenue. The car was going west. It appears that Madison runs east and west, and is a much used street. The street car was carrying a trailer. The plaintiff was in the front car. She alighted at the front end of the first car. The Street Car Company has double tracks on Madison Avenue. The plaintiff alighted on the north side and proceeded south in front of the car and was near the curb on the south side of Madison Avenue when she was hit by the defendant's ambulance. This ambulance was also proceeding west on Madison Avenue at a rate of speed estimated from 20 to 55 miles an hour. It appears that when this ambulance passed the street car, it had the siren horn which utters a shrill shriek and also two other horns on the ambulance blowing.

The plaintiff was knocked down, rendered unconscious, bruised over the greater part of her body, and her skull was fractured at the base. The substance of her brain was injured. She was rushed to the Baptist hospital where she remained for about a month. She was unconscious for several days then remained semi-conscious from ten to twelve days.

To plaintiff's declaration the defendants filed three pleas:

(1) Not guilty.

(2) Contributory negligence.

(3) Ordinance 69, known as ''Jaywalking,'' which is as follows:

''No pedestrian shall cross any street except at a street intersection, and no pedestrian crossing any street intersection shall cross diagonally, but shall use only such crossings for pedestrians as are designated by lines or other mark, or if no lines or marks, shall cross only in the space between curb lines extended and the property lines extending across any street over which said pedestrian intends to pass.''

The case was tried before a jury on December 10, 1931. The jury returned a verdict for the plaintiff in the amount of $15,000. The defendants seasonably filed their motions and amended motions for a new trial. These were overruled. The defendants excepted, prayed and perfected an appeal, and had a proper bill of exceptions filed. They have assigned thirty errors. These thirty assignments will be grouped in five groups and some of the groups will be subdivided.

The assignments raise questions of the admission of evidence, the exclusion of evidence, the charge of the Court, special requests offered by the defendants which were refused, and the excessiveness of the verdict.

By the first assignment or group No. 1, it is insisted that the Court erred in permitting the plaintiff to testify that she had a child, a boy thirteen years of age that she was supporting.

The following appears from the record as to this:

"Q. Have you any children? A. One.

"Q. What is it? Is it a boy? A. A boy.

"Q. How old is he? A. Thirteen.

"Q. Fourteen? A. Thirteen.

"Q. Who has been supporting him, Mrs. Dalehite?

"Mr. Armstrong: 'I object to that, if Your Honor please.

"A. Me, Mrs. Dalehite.

"Mr. Earl King: Don't answer until the court has ruled on it.

"The Court: I don't see any objection to that. Go ahead.

"Mr. Armstrong: The defendant excepts on the ground that it is incompetent, irrelevant and prejudicial.

"The Court: Well, strictly speaking, I don't think it is right.

"Mr. Earl King: All right, we withdraw it."

It is insisted that this was prejudicial error and tended to prejudice the jury against the defendants. And in support of this assignment, counsel for the defendants have cited and rely on Pullman Company v. Pennock, 118 Tenn., 565, 102 S. W., 73; Manufacturing Company v. Woodall, 115 Tenn., 605, 90 S. W., 623; English v. Ricks, 117 Tenn., 73, 95 S. W., 189.

Upon examination of the cases relied on it is shown in each of the three cases cited that the attorneys for the plaintiff and the party who won in the lower Court were guilty of improper conduct and continued the improper conduct after they were admonished by the trial judge.

We do not think that the defendants were prejudiced by the statement of the plaintiff, and especially after her counsel had withdrawn the testimony. There was no motion for a mistrial made by the defendants at the time the evidence was withdrawn. The first assignment is overruled.

Group number two includes assignments 2, 3, and 30. By assignments 2 and 3 the defendants attempted to prove that the ordinance related to motor vehicles passing to the left of a street car when the street car stopped for the discharging and receiving passengers; that it was the general custom in the City of Memphis that ambulances when answering emergency calls when they came up behind a street car, passed it to the left.

Two witnesses testified in the absence of the jury. They stated that they had not heard of the police enforcing the ordinance against ambulance drivers for violating the ordinance known as Section 52.

Mr. Jerome testified as follows:

"Q. You do know it is a general custom with ambulances answering emergency calls in the City of Memphis when they come up behind a car, street car that way, they pass it to the left, isn't it? A. Answering emergency calls it is.

"Q. Answering emergency calls like that, and that was the custom at that time, general custom, wasn't it? A. Yes, sir.

"Q. Almost an invariable custom, isn't it? A. They have always done it.

"Q. They have always done it, and they have not been molested by the police department for doing it—are they? A. The bosses at the different firms generally caution the men about that, but they want to beat the next ambulance there, so they take it in their own hands.

"The Court: You will have to speak louder, I don't hear you.

"The Witness: All the firms caution the men about passing to the left side of street cars, but in order to beat the next firm there they do it.

"Q. At any rate it is the general custom, is it not? A. Yes, sir.

"Mr. Armstrong: All right, that is all I wanted to ask him.

"The Witness: Whether it is the law, I don't know."

The other witness, as to the custom, testified similar to Mr. Jerome.

We shall state here that the defendant National Funeral Home operates a funeral home at 1048 Union Avenue, Memphis, Tennessee. The defendant J. L. Carlisle, 22 years of age, was an ambulance driver. He had been driving ambulances in the City of Memphis for four years. About 7:20 A. M. the day of the accident, a call was received at the defendant's funeral home office to send an ambulance to Poplar Avenue. It appears that the party who wanted the ambulance lived at 624 Poplar. Mrs. Holmes, who answered the phone at the funeral home, understood the call to be for 124 Poplar. The party at 624 Poplar asked that the ambulance be rushed. The ambulance left about 7:25 A. M., with the defendant Carlisle driving it. Mr. Holmes, the husband of the lady who received the telephone message, accompanied Carlisle. This ambulance proceeded west on Union Avenue to Marshall Street, where it stopped for a red traffic light. The ambulance continued north on Marshall to Madison Avenue, and turned west on Madison. When the ambulance approached South Fourth Street, a street car had stopped. The street car was going west. It appears that Fourth Street has an offset. North Fourth is approximately 200 feet east of the intersection with South Fourth. The street car stopped somewhere near the intersection of South Fourth Street.

Madison Avenue is between 49 and 49½ feet wide at the intersection of South Fourth Street. It is seventeen feet and one inch

from the north rail of the street car track to the north curb of Madison Avenue. It is the same distance between the south rail of the south street car track to the south curb on said avenue, leaving approximately 15 feet taken up by the street car tracks. It appears from the record that the street car stop sign for westbound cars is about even with the west property line of South Fourth Street at the intersection with Madison Avenue. The west sidewalk of South Fourth Street is ten feet, two inches in width from the curb to the building line.

There is a controversy as to whether the front end of the motor car stopped even with the car stop sign for westbound cars, or whether it went from twenty to sixty feet west or beyond the South Fourth Street intersection.

In support of the testimony of the two witnesses, excluded as to the custom, it appears from the witness Jerome that the ordinance was violated against the caution of the firms employing the drivers of the ambulances, but the driver, in his zeal to beat some other ambulance to the scene of an accident or to answer an emergency call, violated the ordinance known as No. 52.

Counsel for the defendants rely upon Railroad v. Wade, 127 Tenn., 154, 153 S. W., 1120, "that it was improper for the trial court to exclude from the jury evidence that by custom, ambulances in the City of Memphis had the right of way, and that the driver of an ambulance engaged in an errand of mercy, in response to an emergency call, is not held to strict accountability for violations of municipal traffic regulations."

We are of the opinion that the Ordinance No. 52 attacked by the defendants is a reasonable ordinance passed for the protection of citizens and pedestrians upon the streets of Memphis. And the right to violate a law can never be established by the custom of some who violate it.

"But usage cannot make a contract where there is no contract nor prevent the effect of the settled rules of law." Charles v. Carter, 96 Tenn., 614, 36 S. W., 396; Pencil Co. v. R. R., 124 Tenn., 65, 134 S. W., 613.

In Adams v. Clark, 189 Ky., 279, 14 A. L. R., 738, the Court of Appeals of Kentucky said in regard to the violation of an ordinance by custom:

"It is argued by counsel for appellee that by long usage and custom the people of Kentucky have established a common law which allows the running of fowls at large without the owner incurring liability for their foraging. It is possible for a commonwealth like Kentucky to so establish law, but it is hardly possible where such rule transcends the emphatic and unmistakable enactment of the lawmaking body or a constitutional provision of the State."

"It is the well settled general rule that in order that a custom or usage may be regarded as binding, it is essential that it be legal, and that a custom will not be recognized which is contrary to established law, inconsistent with good morals, or in conflict with the general or public policy of the law. Even though a custom is not contrary to principles of law which are established, it is void if against natural reason and justice, or if based on a disregard of the relations which exist between men, or the duties which in law and morals they owe to each other." 27 R. C. L., 164.

The case of N. C. Railroad v. Wade, supra, does not involve the violation of an ordinance.

"It is the general rule that in order that a custom or usage may be regarded as binding, it is essential that it be legal." Zimmern v. Southern Railway Co., 209 Ill., 284, 29 A. L. R., 1240. We are of the opinion that the Trial Court was not in error in excluding the testimony as to the custom of violating Ordinance No. 52 by ambulance drivers. Assignments 2 and 3 are overruled.

Assignment No. 30 complains of the Court excluding from the jury certain evidence of Mrs. B. W. Blackwell, who was a passenger on the street car from which the plaintiff alighted the morning of the accident. Mrs. Blackwell was near the front part of the car. This witness testified that she heard the siren of the automobile, that she saw it go by the street car like a flash. And the following took place during Mrs. Blackwell's examination: She testified that there was a man to her left, who made the remark, "had she not gotten confused, she would have made it safely." The witness said that she did not know just when the ambulance hit the plaintiff. She did not see it hit the plaintiff.

The Court asked the witness the following question:

The Court: Well, had the ambulance stopped when you heard the remark, or was it before it stopped, and before it struck the plaintiff? A. It was stopped.

Plaintiff's counsel insisted that the man, who made this statement above quoted, was uttering a conclusion or an opinion after the accident.

Counsel for the defendants, in support of this assignment, which they insist as part of the res gestae, rely upon O'Rourke v. Street Railway Company, 103 Tenn., 129, 52 S. W., 872; Street Railway v. Howard, 102 Tenn., 473, 52 S. W., 864; Garrison v. State, 163 Tenn., 108.

The last named case was a committal of murder in the second degree, and the entire Supreme Court agreed that the punishment should not exceed manslaughter. The Court was divided as to a statement made by the defendant, whether it was a part of a res gestae or a self serving declaration.

In the O'Rourke case, our Supreme Court held:

"Sudden exclamations and outbursts of bystanders, as well as of participants, are parts of the res gestae, and as such may be properly brought forward in evidence whenever the occurrence producing them is undergoing judicial investigation."

In that case the Court excluded the testimony of the plaintiff, that when he was being put off the street car two of his children were screaming and were very much upset. There was an issue between the plaintiff and the conductor of the street car as to the manner the conductor used in ejecting the plaintiff from the street car, who the conductor testified did not have proper street car transfers.

We are of the opinion in the instant case that what Mrs. Blackwell heard from a passenger on the street car from which the plaintiff had alighted was a conclusion or an opinion of the man who uttered it, and was not a sudden outburst of a bystander.

The ambulance had stopped before the witness heard the remark from her fellow street car passenger. The proof shows that the ambulance skidded several feet. It dragged her several feet after striking the plaintiff, and during that time before it stopped the passenger, who uttered the exclamation sought to be proven by the defendant as part of the res gestae, had time for retrospection and deliberation. It results that assignment number 30 is overruled.

The next group of assignments are in regard to a complaint against the charge of the Court. They are assignments 4 to 10 inclusive, and certain special requests offered by the defendant. That portion of the Court's charge complained of is as follows:

"The plaintiff further contends, gentlemen, that the defendants through said Carlisle were guilty of negligence in that at the time of said accident said Carlisle was violating the city ordinance which has been introduced in evidence and read to you which provides that no motor vehicle shall be run over the streets of the City of Memphis in excess of twenty-five miles an hour. If you find from the preponderance of the evidence that at the time of said accident the defendant Carlisle was violating said city ordinance, then the court charges you that he was guilty of negligence per se, and if you further find from a preponderance of the evidence that his negligence in violating said city ordinance directly and proximately contributed to said accident, then you should find for the plaintiff and return your verdict for her."

It is contended that this is error because the ambulance driver honestly believed that he was engaged on an errand of mercy, and in an endeavor to save human life, that the ordinance to apply to the defendants under these conditions was unreasonable and invalid.

Our Supreme Court has repeatedly held that the violation of a valid ordinance is negligence per se. Said the Supreme Court in the case of Carroll Blake Construction Co. v. Boyle, 140 Tenn., 178, 203 S. W., 945:

"It is true the violation of a valid city ordinance is negligence per se, and it has been held by this court in several cases that where the act of the defendant in violating the ordinance is the proximate cause of the injury suffered he is liable to the plaintiff. Schmalzried v. White, 97 Tenn., 37, 36 S. W., 393, 32 L. R. A., 782; Adams v. Inn Co., 117 Tenn., 470, 101 S. W., 428."

Likewise in Station Company v. Harper, 138 Tenn., 583, 199 S. W., 394, the Court said:

"We must hold that the ordinance was violated by the plaintiff in error; that the engine in question was at the time of the injury running in excess of thirteen miles per hour, and hence was violating the ordinance; therefore that the plaintiff in error, in so running the engine, through its servants, was guilty of negligence per se. The leading case in our state on this subject is Queen v. Dayton Coal & Iron Co., 95 Tenn., 458, 32 S. W., 460, 30 L. R. A., 82, 49 Am. St. Rep., 935. This case has been followed in Riden v. Grimm Bros., 97 Tenn., 220, 223, 36 S. W., 1097, 35 L. R. A., 587; Wise & Co. v. Morgan, 101 Tenn., 273, 278, 48 S. W., 971, 44 L. R. A., 548; Rhea County v. Sneed, 105 Tenn., 581, 586, 58 S. W., 1063; Iron & Wire Co. v. Green, 108 Tenn., 161, 164, 64 S. W., 399; Railway Co. v. Haynes, 112 Tenn., 712-723, 81 S. W., 374; Railroad v. Martin, 113 Tenn., 266, 281, 282, 87 S. W., 418; Adams v. Iron Co., 117 Tenn., 470, 477, 101 S. W., 428. And see Schmalzried v. White, 97 Tenn., 36, 45, 36 S. W., 393, 32 L. R. A., 782, and Weeks v. McNulty, 101 Tenn., 495, 502-506, 48 S. W., 809, 43 L. R. A., 185, 70 Am. St. Rep., 693.

Several special requests were offered by the defendant and they are as follows:

"I charge you that as applied to an ambulance engaged in an emergency call in an endeavor to save life, the city ordinance limiting the speed of ambulances is unreasonable and invalid, if applied under circumstances where if there had not been such a city ordinance in existence the ambulance was driven at a reasonable and non-negligent rate of speed."

"I charge you that the city ordinance prohibiting passing a standing street car to the left is unreasonable and invalid if applied to ambulances engaged upon an emergency call where the driver of the ambulance honestly believes that he is engaged in an endeavor to save human life and the speed was imperative, provided that a reasonably prudent man so situated as the driver of the ambulance was situated

would have passed the standing street car to the left.''

''A different rule of law applies to one engaged in an endeavor to save human life and one on an errand of mercy from that which applies to one not so engaged.''

In support of defendants' contention, that the ordinance relative to passing a street car on the left while the street car was stopped and engaged in discharging and receiving passengers, counsel cited a number of Supreme Court opinions from other states. Some cities, and some states make an exception of speed statutes and ordinances and ordinances similar to the ones relied on by the plaintiff when a fire truck or ambulance is involved. But we have no statute or ordinance of the City of Memphis making an exception for an ambulance or a fire truck.

In the case of Lamar and Smith v. Stroud, 5 S. W. (2d), 825, decided in the Court of Appeals in Texas in 1928, Mrs. Smith, it appears, was injured in an accident while she was riding on a motor bus owned by Coffman. The bus was run into by an ambulance at the intersection of two streets. There was a statute of the State of Texas that exempted police patrols, fire wagons, ambulances or physicians answering emergency calls. Mrs. Smith relied on certain city ordinances of Dallas regulating traffic on the streets.

The Court said in passing on the appeal:

''It conclusively appears that in crossing the street at the time of the collision the driver of the ambulance violated a valid city ordinance which required him to stop and await the appearance of the green light. The jury found that he was 50 feet from the crossing when the signal light changed from red to orange. The evidence showed that he failed to stop his car, but proceeded at a rapid rate of speed without waiting for the appearance of the green light. While ambulances are exempted from the speed limitations, they are not exempt from the local regulations prescribed by the city for the control of the traffic at street intersections. The fact that ambulances are given the right of way over other vehicles did not license them to disregard the signal regulations when crossing another line of traffic, or to travel anywhere in the city at a rate of speed which might endanger life or property.''

The Court further said:

''There was evidence tending to show that the police officials had been accustomed to permit ambulances to disregard the orange light under such conditions. But, even if that were true, the wrongful indulgence of the police department would not cure the infraction of the ordinance, or relieve the driver of the ambulance from the legal effect of having violated the positive provisions of an existing traffic regulation. The police officials could not by connivance legalize what

the governing body of the city had prohibited. In that view of the evidence, the rate of speed at which the ambulance was traveling when the collision occurred is of little or no importance. The facts make it plain that, if the driver of the ambulance had stopped his car in obedience to the city ordinance, there would have been no collision with the bus, and no injury to the plaintiff. The fact that the driver of the bus also negligently disregarded the signal light, or was driving at an excessive rate of speed, cannot justify the driver of the ambulance disregarding the requirements of the ordinance."

In the case of Spencer and Shiffman, decided in 1932 by the Supreme Court of California, reported in 7 Pac. (2d), 361, a policeman was answering an emergency call. The policeman was operating a motorcycle. He collided with Shiffman who was driving an automobile. By the statutes of California a motorcycle police was excepted from the speed limitations when answering an emergency call.

The Court said:

"The driver of an emergency vehicle is not relieved from the duty to drive with due regard for the safety of all persons using the highway nor from the consequence of the arbitrary exercise of the privileges theretofore declared in the statute."

In the case of West v. Jaloff (Ore.), 233 Pac., 642, 36 A. L. R., 1391, the plaintiff was injured by being struck by an ambulance in the City of Astoria.

The defendants pleaded an exemption of patrol wagons, ambulances, fire patrols, fire engines and fire apparatus from the requirements of an ordinance demanding the driving of all motor vehicles in a careful and prudent manner not to exceed thirty miles per hour.

The Court said:

"Granting the right of way to an ambulance is one thing, and granting the right to exceed the statutory speed is another.

Whatever right of way defendant's machine may have had by virtue of its being an ambulance has no relation to the speed at which it was traveling, if such speed was above the statutory limit for automobiles in general, which at street intersections is 12 miles an hour; and in respect to the speed in this particular case there was abundant evidence to go to the jury that the speed was above the statutory limit. In fact, this might also be said to be a case where the doctrine of res ipsa loquitur in itself would indicate that the machine was being driven at an enormous rate of speed, or at least greatly in excess of 20 miles an hour."

When a statute prescribes a certain limit of speed for motor vehicles and no exceptions are made, the courts have held that exceptions will not be grafted on to the plain provisions of the law. Hud-

son v. Carton, 37 Ga. App., 634, 141 S. E., 222; Keevil v. Ponsford (Tex. Civ. App.), 173 S. W., 518.

Where emergency vehicles are by ordinance or statute given a right of way over other vehicles they are not, in exercising this right of way, justified in disregarding the law of the road, the statutes of the State or municipal traffic regulations. Nor will the right of way granted excuse it from the exercise of all due care for the protection of others. 3 & 4 Huddy Ency. of Automobile Law, page 286.

The city authorities of Memphis made no exceptions for ambulances or other vehicles in the ordinances introduced and relied on by the plaintiff. We are of the opinion that the ordinances are not unreasonable and they are not invalid. The city passed these ordinances to protect the lives of pedestrians and others using the streets of Memphis, and it is just as necessary to protect the life of a pedestrian crossing a public street in the congested portions of the City of Memphis as it is to answer an emergency call with an ambulance. An ambulance in the City of Memphis or elsewhere in the State of Tennessee, in our opinion, while a useful vehicle for answering emergency calls, should not be converted into a Juggernaut to crush a human being beneath its wheels. Assignments 4 to 10 inclusive are overruled and disallowed.

We will next consider the group of assignments which complain of the Court's charge as to punitive damages, and the special requests relative to the Court's charge on punitive damages.

The Court told the jury under proper instructions that they could find, if the evidence warranted, punitive damages against the defendants or "smart money." But if they did assess any punitive damages then the amount assessed should be returned in a separate verdict. That is the jury, if they found punitive damages in addition to com- pensatory damages, should return a verdict stating the amount of the compensatory damages and the amount of the punitive damages. The jury found no punitive damages. The defendants are not prej- udiced by any charge as to punitive damages, the jury finding in favor of the defendants as to same. All assignments as to punitive damages and the special requests relative to same are overruled. These are assignments 13, 14, 15, 16 and 17.

It is next complained in a group of assignments that the Court was in error in its charge as to an ordinance relied on by the defendants and commonly called the "Jay Walking Ordinance."

There was a conflict in the evidence as to whether or not the street car had gone beyond the crossing when the plaintiff alighted and she alighted at a point beyond the intersection of South Fourth Street and Madison Avenue. What the Court said in regard to the Jay Walking Ordinance was as follows:

"The Court charges you that this 'Jay Walking Ordinance' is a valid ordinance, and its violation is negligence per se, and would defeat a recovery by the plaintiff in this lawsuit provided you find from the preponderance of the evidence that at the time of said accident the plaintiff was violating said city ordinance, and provided you further find from the preponderance of the evidence that her negligence in violating said city ordinance directly and proximately contributed to said accident. So the Court charges you, gentlemen, that if you find from the preponderance of the evidence that at the time of said accident the plaintiff was violating said city ordinance, then she was guilty of contributory negligence, per se, and if you further find from the preponderance of the evidence that her negligence in violating said city ordinance directly and proximately contributed to said accident, then you should find for the defendants on their plea of contributory negligence and return your verdict for them."

This Court had before it the "Jay Walking Ordinance" in the case of Yellow Cab Co. v. Jelks, 9 Appeal Reports, page 288. In that case this Court said in construing the "Jay Walking Ordinance" of Memphis:

"A pedestrian has the right to cross the street. A city may, with reasonableness, designate where the crossing is to be, but in the instant case there were no designated lines within which the plaintiff was to walk while crossing from the east side to the west side." The plaintiff in that case crossed from curb to curb at the intersection of Monroe Avenue and Front Street, and when within the street he had as much right to the street as the defendant Taxicab.

In the instant case it was a question for the jury, whether or not the plaintiff violated the Jay Walking Ordinance. There was proof that the street car was using that portion of the street designated for pedestrians. The plaintiff had a right to cross in front of the street car from the north side of the street to the south side, as she did cross.

The Court charged the jury after instructing them as to plaintiff's duty towards the Jay Walking Ordinance, as follows:

If, however, gentlemen, you find from the evidence that the street car did not stop in said space, but continued west thereof, no matter what the distance west you find it continued before stopping, then the plaintiff, when she alighted from the street car, had the right either to have walked over to the north side of the street, or to have passed in front of the street car and gone to the south curb, and in such event she would not have had to walk around the street car and then east back to said space enclosed by the lines to which the Court has referred before proceeding to the south curb, but could and

had the right to have passed around the west end of the street car and gone to the south curb, regardless of the lines if projected across the street."

We are of the opinion that this charge as to the Jay Walking Ordinance did not prejudice the defendants, and this group of assignments relative to the charge on the Jay Walking Ordinance and the requests of the defendants in regard to charging on the ordinance are overruled.

It is next insisted by assignment number 21 that the Court erred in giving a special instruction asked by the plaintiff, which was as follows: "One who has been placed in a position of danger by another's fault or negligence will not be denied relief for injury resulting therefrom by reason of the fact that she, in the excitement of the moment, lost her presence of mind and in an honest effort to save herself injury, by mistake pursued the wrong course. For one who is placed in an apparent situation of sudden and imminent danger without her own fault is not, as a matter of law, guilty of contributory negligence, because she acts upon appearances of danger which had not, in fact, existed, or fails to make the most advantageous choice between the expedients which the situation presents for seeking her safety, or because she might have escaped injury had she acted differently. The obligation resting upon her to exercise ordinary care does not extend so far as to require her to act with all the care and caution which might be reasonably required of her under ordinary circumstances."

Following this special request the Court charged the following special request offered by the defendants:

The doctrine that one who is placed in a position of danger by the negligence of another has no application where the position of danger is also brought about by the negligence of the person who is in a position of danger. Therefore if you find from the evidence that Mrs. Dalehite was placed in a position of danger in part by her own negligence, she would not be excused for any negligent mistake of judgment because of being placed in a position of danger.

"The driver of an automobile cannot successfully invoke the emergency rule where his own negligence led into the emergency." Cullom v. Glasgow, 3 Tenn. App., 443; Allen v. Schultz (Wash.), 6 A. L. R., 676.

"Whether an emergency existed is a question for the jury." Noshey and Schwab v. Armour Slover, 14 Tenn. App., 42.

In the case of Chattanooga Electric Car Company v. Cooper, Administrator, 109 Tenn., 313, 70 S. W., 72, Mr. Chief Justice Beard, in delivering the opinion for the Court, among other things quoted as follows from Thompson on the Law of Negligence, Vol. 1, section

195: 'One who is placed in the apparent situation of sudden and imminent danger, without his own fault, is not, as matter of law, guilty of contributory negligence, because he acts upon appearances of danger which had not in fact existed, or fails to make the most judicious choice between the expedients which the situation presents for seeking his safety, or because he might have escaped injury had he acted differently. The obligation resting upon him to exercise ordinary care does not extend so far as to require him to act with all the care and caution which might be reasonably required of him under ordinary circumstances.' To the same effect is Wharton on the Law of Negligence, section 304.

The text of each of these authors is supported by the opinions of courts of the most eminent respectability, as well as, we think, by sound reason; for to require that one in the midst of peril, or in the presence of impending danger, should act with the prudence of an ordinarily careful man under ordinary circumstances, would be to put a strain on human nature which all experience shows it would not be able to bear."

Giving the two special requests, one by the plaintiff and the other by the defendant as to the doctrine of sudden emergency, we think, was not error, and assignment number 21 is overruled.

By another group of assignments, it is insisted that the Court refused to charge the following special requests set out in assignments 23, 24 and 25, in which it was insisted that the Court should charge that the jury could not guess or speculate as to any injuries or consequences of the accident, that the jury could not guess or speculate whether the plaintiff had suffered any permanent injuries.

The Court charged the jury as follows as to injuries, "that you can only consider as elements of damages in the case, if you find for the plaintiff the injury or injuries which plaintiff has shown by the preponderance of the evidence she received or sustained as a result of said ambulance running upon and over her, and also any injury or injuries she has shown by the preponderance was the direct and proximate result of the injury she received or sustained by reason of said ambulance running upon and over her."

We do not think that the jury was left to speculate as to plaintiff's injuries. These assignments as to the refusal of the special requests on guessing or speculating are overruled. We have examined the Court's charge and all the special requests offered by the defendants and refused by the Court. It appears from the transcript that the defendants, at the conclusion of the Court's charge, offered twenty-eight special requests. Four of these were granted, the others refused. Taking the entire charge we find no prejudicial error in it. The special requests refused were either covered by the charge, or they were not accurate statements of the law.

We find that on the question of damages, the Court told the jury if they found the plaintiff was entitled to damages, as follows: "you may take into consideration in estimating the compensatory damages, the personal pain and suffering, mental and physical of plaintiff, resulting from her injuries and the consequence of a permanent injury if the evidence justifies such a finding."

The Court further charged:

"The physical pain and suffering is not confined to that which may have been suffered before the trial but includes such future suffering as it is reasonably certain from the evidence must result from the injury."

As to the measurement of damages, the Court said:

"Compensation for the injury and its results is what the law awards in all such cases. But the law furnishes no fixed rule by which you can estimate with exactness and certainty the compensatory damages allowable for such injuries, and for the pain and suffering, mental and physical if shown, growing out of the injury. The law commits the determination of such elements of damage to the wise discretion of the jury under the evidence, enjoining upon you the exercise of sound judgment, free from passion and prejudice."

All the assignments on the Court's charge and as to the special requests refused are overruled and disallowed. And this brings us to the last group which relate to the insistence that the verdict is excessive. And in support of this insistence, counsel state that in determining the reasonableness of the verdict for personal injuries, the Court is authorized to consider the present purchasing power of the amount of money awarded. Authorities are cited in support of this proposition. It is true that the American dollar today has a greater purchasing power than it had 8 or 10 years ago, in the purchase of many articles, but in some respects the dollar is no greater today than it was 8 or 10 years ago. It doesn't pay any more on taxes, or interest on debts. And we do not know that medical services, hospital bills and medicines have been reduced any. But in passing upon the excessiveness of the verdict we will take into consideration the present purchasing power of the American dollar.

It appears from the record that the plaintiff suffered serious injuries. She was rendered unconscious. Her skull was fractured at the base, and the cells and substance of her brain were seriously injured.

There is evidence by the brain expert that there is a two per cent chance that she will be subject to epilepsy.

"She had a bruising of the scalp, blood between the skull and the scalp, had the evidences of percussion and concussion and edema to the brain evidenced by unconsciousness and the general effect on the

brain and certain other signs which pointed to the back part of the brain, cerebellum and occipital region.'' We have quoted the language of Dr. R. E. Semmes, a brain specialist, who treated the plaintiff.

In addition the plaintiff had other bruises upon her body besides the fractured skull. Her brain was shaken up by the force of the blow. It took two months for the wound on her head to heal. At the time of the trial, which was fourteen months after the injury, she had not recovered. The injury to her brain has such an effect on her optical nerves so that she has lost the sense of equilibrium. When she looks up she becomes dizzy and falls. She has lost her sense of smell. She suffers with severe headaches, and almost unbearable pain that draws her head back, which she described at the trial was like meningitis.

She was receiving $35 per week at the time of the injury. She had not lost a day from her work for six or seven years. She showed a pecuniary loss from the time of the accident to the day of trial of about $3000. From the time of the accident to the day of trial she had suffered continously from nervousness, irritability and lack of control.

''There is no fixed rule by which damages for personal injuries can be ascertained or mathematically calculated.'' Yellow Cab Co. v. Jelks, 9 Tenn. App., 293.

We are of the opinion that anyone injured, who is told that there was a two per cent liability of the injured party having epilepsy, would have cause for great mental anguish.

''The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the Judge who presided at the trial and heard the evidence.'' Reeves v. Catignani, 157 Tenn., 176, 7 S. W. (2d), 38.

Each case on the question of the amount of the verdict is determined by the peculiar facts of the case tried. Cases by the Courts of last resort so far as the amount of the judgment is concerned, that is returned for personal injuries, could be cited in which the jury had given a larger amount for similar injuries in the instant case, and likewise cases cited in which the Courts have allowed smaller amounts. But these cases do not help the Court in determining whether or not the verdict in the instant case is excessive.

It has been well said in passing upon the question, whether or not the verdict is excessive in a personal injury case that the damages therefor must be so excessive as to strike mankind, at first blush, as being beyond all measure unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short the damages must be flagrantly outrageous and extravagant or the court cannot undertake to draw

the line: for they have no standard by which to ascertain the excess.'' Coleman v. Southwick (1812), 9 Johns (N. Y.), 45, 6 Am. Dec., 253.

And in another case, the learned Judge Storey said, with respect to the size of verdicts:

''Upon a mere matter of damages where different minds might and probably would arrive at different results and nothing inconsistent with an honest exercise of judgment appears, I for one, should be disposed to leave the verdict as the jury found it.'' Thurston v. Martin, 5 Mason, 497.

The last group of assignments as to the verdict being excessive is overruled.

We are of the opinion that the defendants have had a fair and impartial trial. It does not affirmatively appear that any errors complained of effected the verdict. Chapter 32 of the Acts of 1911 applies.

We are of the opinion that this law suit developed a clear case of liability against the defendants.

The learned Trial Judge, who patiently sat during the long, tedious trial and overruled the motions of the defendants for a new trial, said:

''First, on the question of contributory negligence, the Court is of opinion, and so held at the time, and it is a fact of common knowledge —we all know it, and see it nearly every day, those who ride on street cars, that people very frequently when they get off of a car pass in front of the car to the side of the street that they desire to go to. I don't think the plaintiff was guilty of any negligence at all in having passed in front of the street car to the south curb of the street.

Now, while she was doing that, this ambulance was approaching, sounding its horn or siren, and just before she reached the curb, she was struck. Now, the driver of the ambulance attempted to state the speed he was going at the time he attempted to pass the street car. This street car had a trailer on it. I remember he stated that he was going about eighteen miles an hour, or some such rate of speed, when he was about the front end of the trailer. Well, after he attempted to pass the street car he saw a man pass in front of the street car, but the proof is silent as to just exactly where that man went; the proof shows, however, that he passed on ahead. Well, after he saw that man come out there, then the plaintiff appeared, and she had crossed that street, the space between the tracks, and headed across from the track, and some of the witnesses put the accident as having occurred over or near the south rail of the eastbound track. He states what he attempted to do. He says he first veered to the south, thinking he could pass her on that side, but then he states that that was the first time, apparently, that she saw the car, or took any notice of its approach; that then he attempted to veer to the north, when

she stepped back in the path of the car and was struck. Now, in view of these facts, gentlemen, and what he saw about that man going across there; that she had traversed the street that distance from the time that he attempted to pass the street car—pass the rear end, the Court cannot find, and is not of opinion that she was guilty of contributory negligence. He didn't see her until he was at the front end of the trailer, and she came by, and yet, traveling the length of the street car proper, going at the rate of speed that he was, he had her going from the front end of that car clear over across the south rail of the eastbound track. I cannot find from this evidence, that she was guilty of contributory negligence.

Now, as to the amount of damages, this was a very severe injury: I don't think that is debatable. When Mr. Armstrong asked the doctor using in his question the word "concussion," the doctor stopped Mr. Armstrong and said that "concussion," was not the right word; that while this was a concussion, it was more than a concussion. The word that he used for "slosh," that her brain was sloshed, and he stuck to his word "sloshed," meaning that it was far more of an injury than a concussion. . . . If a man falls down on the floor and gets a pretty good bump, there might be a concussion, whereas, there might not be what he calls this injury, which he says is worse than a concussion—a sloshing. He states that her brain was actually injured, like you would injure a man's arm, and he stated the effect of the injury. Now, he stated that there was a fracture of the skull. He stated that both tables of the skull had been fractured. . . . that the outer and inner tables had been fractured; a complete fracture of the skull. These injuries have continued for fourteen months. He states that he doesn't know, and nobody can tell whether she is going to get well, or not. Now, it is true that he proved the per cent—that eighty per cent would probably recover, or would recover according to the statistics on such subjects, and that they show that twenty per cent will not recover. Of course, there has been an improvement. The proof shows that she cooked around home, but the proof shows that this injury to the brain has been there for fourteen months, with nobody being able to tell, and it being beyond the province of an expert to determine whether she is going to get well, or not. You have a right to take into consideration the future probabilities of the injury as well as that actually shown, her great nervousness, inability to sleep—all of those things. The Court cannot say, and is not willing to say that $15,000 is excessive for her injuries."

We are not unmindful that this case was ably argued at the bar by counsel representing both parties to this law suit. We have been furnished with splendid printed briefs by both parties. However as a final conclusion, we are of the opinion that there is no reversible

error in the record. All the assignments of error are overruled and disallowed. The judgment of the lower court is affirmed. The plaintiff will recover of the defendants the amount of the judgment rendered in the lower court, with interest thereon from the date of its rendition, for which execution will issue. Execution will issue against the defendants and their surety on appeal bonds for the amount of the costs of the cause, including the cost of this appeal, for which execution will issue.

Heiskell and Senter, JJ., concur.