CITY OF NASHVILLE v. BROWN.—157 S. W. (2d), 612.

Middle Section.    May 10, 1941.

Petition for Certiorari denied by Supreme Court, January 17, 1942.

C. G. Blackard and W. C. Cherry, both of Nashville, for plaintiff in error.

Walker & Hooker, of Nashville, for defendant in error.

FELTS, J. Sina Belle Brown was riding as a guest of Logan Gaines on the rear seat of his automobile. As he drove over a "dish gutter" across Shelby Avenue in Nashville, she was thrown violently against the top and front seat of the car, and suffered a concussion of the brain, fractures of three vertebrae, and a rupture of the liver.

She brought this suit against the City of Nashville for negligently causing her injuries by creating and maintaining in the street a dangerous condition which "amounted to a trap or a nuisance." The City pleaded the general issue. It also filed some special pleas, which need not be set forth.

She obtained a verdict for $30,000. The trial judge suggested a remittitur of $5,000, which was accepted, and judgment for $25,000

was entered for her against the City. The City appealed in error, and insists that a verdict should have been directed for it, or at any rate, a new trial should be granted for errors in refusing to give instructions it requested and because the verdict is so excessive as to indicate passion, prejudice, and caprice on the part of the jury.

The accident happened December 26, 1931. On March 19, 1932, Sina Belle Brown gave the City notice as required by Code, sec. 8596. On March 22, 1932, she sued the City and Logan Gaines. On July 3, 1933, he paid her $2,500 for a covenant not to sue him. She dismissed the suit as to him, and on May 22, 1935, she also took a nonsuit as to the City. On May 25, 1935, she brought the present suit.

Sparkman Street bridge was one of the bridges across Cumberland River, connecting East Nashville with the rest of the City. Shelby Avenue extended from Sparkman Street bridge east through a section of East Nashville. It was an arterial highway and one of the main arteries of crosstown traffic. It was about forty feet wide and was a smooth, asphalt-paved street. It was paved during the summer and fall of 1922. This work, except at street intersections, was done pursuant to the abutting property law, one-third of the cost being paid by the City and two-thirds by the abutting property owners. The City's governing authority, the Board of Public Works, by an appropriate resolution on May 9, 1922, directed that the work be done according to the abutting property law and according to plans and specifications to be prepared and placed on file in the office of the City Engineer. Such plans and specifications were prepared by the City Engineer, kept on file in his office and the paving except at the intersections was done by a contractor under contract with the City. The work at the intersections was done by the City's own force. After all the work was completed it was accepted and an assessment was made against the abutting properties. This was done by resolution adopted by the Board of Public Works on July 27, 1923.

The dish gutter in question was constructed by the City across Shelby Avenue at its intersection with Fourth Street. Fourth Street, a side street, ran north and south across Shelby Avenue. Fourth Street was paved, somewhat higher in the center than at the curbs. Along its east curb there was an open drain to permit surface water to flow toward the south. The City constructed the dish gutter along the east edge of the intersection of Shelby Avenue and Fourth Street so as to continue the drain across Shelby Avenue and on south along the east curb of Fourth Street. Photographs and maps showing the gutter and the intersection are sent up. The gutter was made of granite blocks, while the rest of the intersection was paved with asphalt. The gutter of granite blocks was 9 feet wide and extended all the way across Shelby Avenue from the north curb to the south curb. The bottom or the "flow line" of the gutter was on a straight line with the east curb of Fourth Street, and was 3 feet east of the west

margin of the granite blocks and 6 feet west of their east margin. This flow line was from 2¼ to 3 inches lower than the east and west margins of the granite blocks, but was 9 or 10 inches lower than the surface of Shelby Avenue at points 13 or 14 feet east and west of the bottom of the gutter. Otherwise stated, through this space of 27 or 28 feet (14 feet east and 14 feet west of the gutter) Shelby Avenue made a "dip" of some 9 or 10 inches.

Also this dip was at the crest of a hill. The car in which plaintiff was injured was going east on Shelby Avenue, crossing over this dip. Shelby Avenue going east toward this dip was upgrade, the grade being about 8%. This grade started about 300 feet before reaching the dip and continued on to about 13 or 14 feet from it, where the downgrade or dip began. An automobile approaching this dip at night, as Gaines' car was, going up this grade, would throw its lights above the dip so that one could not see it until he was very close to it. Photographs sent up show that in the daytime one so approaching the dip could not see it until he was within 50 or 60 feet of it; and at night, on account of the lights being deflected up, one could not see it until he was within 25 feet of it, even if he knew it was there and was looking for it.

This condition remained the same from the time the gutter was constructed in 1922 until after the accident in 1931. In 1922, the maximum speed limit of automobiles in Nashville was 20 miles per hour. Some time before 1931 the maximum speed limit on arterial highways was changed to 30 miles per hour. A daily average of between 5,000 and 6,000 automobiles passed over Shelby Avenue.

Expert testimony for the City was that the gutter was built according to approved and sound engineering practice and that it was necessary to take care of the drainage; while the testimony for plaintiff was that it was not built according to proper engineering standards, but was "poor construction" and "dangerous," and that the drainage could have been as well taken care of by a "box culvert" (underground culvert) with the street smoothly paved over it. It was stipulated that this was the only suit that had been brought against the City on account of any accident occurring at the intersection while the dish gutter was there; but plaintiff called some 12 or 13 witnesses who testified that in going over the gutter in an automobile at less than the maximum speed limit they had received severe jolts, lost control of the car, broken out windshields, broken springs, and occupants on the rear seat had been thrown against the top of the car and some of them injured. Witnesses for the City admitted that unless one slowed down below the maximum speed in going over the gutter he would get a severe jolt. The present City Engineer, Mr. Beasley, admitted on cross-examination that in driving over the gutter with people on the back seat in his car he had had them complain that "it would throw them up."

As stated, the accident to plaintiff occurred about 6:30 P. M., December 26, 1931. Logan Gaines, in company with two other persons, was taking her from uptown to the home of her sister, 906 Shelby Avenue, where she was living. Miss Waters, a friend of plaintiff and a stenographer of Governor Roberts, was riding on the front seat with Gaines, and a Mr. Bomar, of Louisville, Kentucky, and plaintiff were on the rear seat. Gaines drove across Sparkman Street bridge and east along Shelby Avenue toward its intersection with Fourth Street. It was dark, and his lights were burning. It does not appear that he had ever driven over the dish gutter or knew it was there. He was driving about 25 or 30 miles an hour. Plaintiff knew of the gutter, but was engaged in conversation with Mr. Bomar and did not realize they were approaching it. When the car ran into it, she was thrown against the top of the car and fell forward against the front seat. She was rendered unconscious and remembered nothing until the doctor came to see her that night. The foregoing is her account of the accident. None of the others in the car testified. It seems all of them were unavailable as witnesses at the time of the trial in 1940.

The first issue between counsel is whether upon the facts above stated it could be reasonably found that the City had breached any legal duty to plaintiff.

■■ The general rule is that a city or town holds its streets in a proprietary and not a governmental capacity, and its duty to construct and maintain them is a corporate duty and not a governmental function. Fleming v. Memphis, 126 Tenn., 331, 337, 148 S. W., 1057, 42 L. R. A. (N. S.), 493, Ann. Cas. 1913D, 1306; Shepherd v. City of Chattanooga, 168 Tenn., 153, 155-157, 76 S. W. (2d), 322; City of Knoxville v. Gervin, 169 Tenn., 532, 538, 89 S. W. (2d), 348, 103 A. L. R., 877; Boyd et ux. v. City of Knoxville, 171 Tenn., 401, 405, 104 S. W. (2d), 419. To construct and maintain its streets in a reasonably safe condition is a corporate duty, and a city or town is answerable for a breach of that duty. Town of Gainesboro v. Gore, 131 Tenn., 35, 37, 173 S. W., 442; Swain v. City of Nashville, 170 Tenn., 99, 101, 92 S. W. (2d), 405. The measure of that duty is the exercise of ordinary care by the city or town to keep its streets in a reasonably safe condition for travel day and night in the customary modes by persons themselves exercising reasonable care. Swain v. City of Nashville, supra; 7 McQuillin on Municipal Corporations (2 Ed.), sec. 2910, pp. 32-38, and cases there cited.

■■ What may be regarded as an exception to this general rule is the rule by which a city or town is often exempted from liability for personal injuries resulting from its adoption of a plan of construction or improvement of its streets. This rule of exemption seems to rest upon the idea that the adoption of such a plan by the governing authority of the city or town is not a corporate but a governmental

function and that generally there can be no liability for the exercise of such a function. 6 McQuillin on Municipal Corporations (2 Ed.), secs. 2805, 2804, pp. 1078-1089; Vol., 7 secs. 2955, pp. 120-123; see cases cited in the Annotation in 90 A. L. R., pp. 1502-1529. This rule, however, has narrow limits and is subject to many qualifications. Stern v. International R. Co., 220 N. Y., 284, 115 N. E., 759, 2 A. L. R., 487, 493; Annotation, 90 A. L. R., 1511-1529; 6 Dillon on Municipal Corporations (2 Ed.), sec. 2804, Vol. 7, sec. 2955. One of such qualifications is that the plan adopted must not be too dangerous. But the city or town will be exempt from liability unless the plan is so manifestly dangerous that a court can hold, as a matter of law, that it is dangerous. Swain v. City of Nashville, 170 Tenn., 99, 102, 92 S. W. (2d), 405, 406.

For the City it is argued that the gutter was constructed in accordance with the plan adopted by the Board of Public Works and according to approved and sound engineering practice; that if it was not safe it was at least not so dangerous that a court could hold it to be dangerous as a matter of law; and that under the rule of nonliability applied in Swain v. City of Nashville, supra, a verdict should have been directed for the City.

It appears, however, that the gutter was not constructed according to the plan adopted by the Board of Public Works. That plan called for a "15 inch box culvert," an underground culvert with the street smoothly paved over it. Several months after the plan was made Mr. Southgate, then the City Engineer, made the change by which the dish gutter was constructed instead of the box culvert. It does not appear that this change was ever called to the attention of the Board of Public Works or ever ratified by the Board; and Mr. Beasley, the present City Engineer, admitted on cross examination that there was never any plan adopted by the City calling for the dish gutter.

But learned counsel insist that the resolution adopted by the Board of Public Works on July 27, 1923, reciting that the work had been completed and accepted, and making the assessment against the abutting property, amounted to a ratification or adoption of the dish gutter as a part of the plan, so as to bring the case within the rule of nonliability. We do not think so. The part of this resolution referring to the completion and acceptance of the work was as follows:

"Whereas, in accordance with Section 42 of the City Charter, and in accordance with Resolution No. 413 duly adopted and confirmed by the Board of Public Works, the improvement of Shelby Avenue, from Second Street to Tenth Street, thereby authorized has been completed and accepted, and . . ."

Resolution 413, here mentioned, did not refer to any plan for the dish gutter, but on the contrary the plan under that resolution called for a "box culvert." The fact that the City Engineer, Mr. Southgate, had substituted the dish gutter for the box culvert and the fact that

it had been completed before the adoption of this resolution on July 27, 1923, are not sufficient to show that the Board of Public Works, the City's governing authority, adopted the dish gutter as a part of the plan. Governmental action, legislative or judicial, can appear only in affirmative and specific acts, ordinances, resolutions, judgments, or decrees and not from mere silence and inaction.

██ Almost all the authorities hold that in order to exempt a city or town from liability the plan must be formally adopted by its governing authority. It is necessary that the exact matter under consideration, in this case the dish gutter, should have been brought to the attention of the governmental body and that that body should have expressly ordered that particular thing to be done. Gould v. Topeka, 32 Kan., 485, 4 P., 822, 49 Am. Rep., 496; Ford v. Des Moines, 106 Iowa, 94, 75 N. W., 630; Hodges v. Waterloo, 109 Iowa, 444, 80 N. W., 523; Urquhart v. Ogdensburgh, 97 N. Y., 238; Brown v. Syracuse, 77 Hun., 411, 28 N. Y. S., 792; Collett v. New York, 51 App. Div., 394, 64 N. Y. S., 693; Clemence v. Auburn, 66 N. Y., 334; Stanley v. Chicago, 177 Ill. App., 245; Stern v. International R. Co., 220 N. Y., 284, 115 N. E., 759, 2 A. L. R., 487; McQuillin on Municipal Corporations (2 Ed.), sec. 2804, p. 1080, and cases there cited. See, also, Annotation, 90 A. L. R., 1525, 1526. That the City cannot claim exemption from liability merely by reason of the action of its engineer in putting in the dish gutter and its subsequent silence and acquiescence in the condition thereby created, is established by our own cases of City of Knoxville v. Camper, 21 Tenn. App., 210, 214, 108 S. W. (2d), 787, and Nashville v. Sutherland, 94 Tenn., 356, 29 S. W., 228.

██ So the issue is whether in creating or maintaining this condition in the street the City was guilty of negligence; whether it breached its corporate duty to construct and maintain the street so that it would be reasonably safe for travel in the usual modes by persons exercising reasonable care; or whether this condition was a defect or obstruction so dangerous that it might be reasonably anticipated that it would cause injury to travelers so using the street. Where the evidence is conflicting or where the facts are such as to authorize different inferences as to whether a defect is a dangerous obstruction calculated to cause injury, the question is one of fact for the jury. City of Memphis v. McCrady, 174 Tenn., 162, 166, 124 S. W. (2d), 248, 249; Village of Plainview v. Mendelson, 65 Neb., 85, 90 N. W., 956, 957. In 7 McQuillin on Municipal Corporations (2 Ed.), sec. 2909, p. 31, it is said:

"If in the given case there is a reasonable basis for a difference of opinion among sensible and fair-minded men on the question of the reasonable safety of the street involved, it becomes a question of fact for the determination of the jury" (citing cases).

██ Upon the evidence, construed most favorably to plaintiff, as must be done, we think reasonable minds might justifiably draw different inferences as to whether the condition at the gutter was a

defect or obstruction so dangerous that it might be reasonably expected to cause injury to travelers using the street, with reasonable care, for the purposes for which it was intended. The street was an arterial highway, smoothly paved for automobile traffic; and some 5,000 or 6,000 automobiles daily passed over it. For some time before the accident the maximum speed limit had been 30 miles per hour. As stated, the street through a space of 27 or 28 feet made a dip of some 9 or 10 inches. This dip was "buried behind the crest of a hill" so that a motorist at night approaching as Gaines' car was could not see the dip, even if he knew it was there and was looking for it, until he was within about 25 feet of it. There was expert evidence that the dip was "poor construction" and "dangerous." There was also evidence that the drainage could have been as well taken care of by the box culvert. Before the dish gutter was put in there had been a box culvert at the intersection. So the risk of injury from the dish gutter seemed unnecessary and unreasonable, since it could have been eliminated by using the box culvert.

That this is the only suit against the City on account of injuries suffered there "is not decisive." Stern v. International R. Co., 220 N. Y., 284, 115 N. E., 759, 2 A. L. R., 487, 493. Evidence for plaintiff was that many persons crossing the dip in automobiles at less than the maximum speed limit had suffered severe jolts, broken out windshields, broken springs, and occupants on the rear seat had been thrown against the top of the car and some of them injured. This evidence was persuasive that the condition there was so dangerous that it might be reasonably expected to cause injuries similar to those here sued for. John Gerber Co. v. Smith, 150 Tenn., 255, 264, 265, 263 S. W., 974; 7 McQuillin on Municipal Corporations (2 Ed.), sec. 2913, pp. 44-46. Defects in the street similar to this one have been held actionable negligence. Voorhees v. Nassau County, 251 App. Div., 902, 297 N. Y. S., 78. In Blackwelder v. Concord, 205 N. C., 792, 172 S. E., 392, 90 A. L. R., 1495, relied on by the City, the passenger in the automobile was injured by an open gutter across a side street at the entrance to an arterial highway. The majority held the town not liable, while a dissenting opinion held it liable. Both opinions assumed that such a defect constituted negligence, but the majority opinion held that the gutter had been built according to the plan adopted by the City in the exercise of its governmental function and that "for injury resulting from the negligent exercise of such a power a municipality is exempt from liability" (205 N. C., 792, 172 S. E., 393, 90 A. L. R., 1497).

Learned counsel for the City argue that plaintiff was injured by reason of the negligence of Gaines or her own contributory negligence. The only evidence in the record as to the speed of the car was plaintiff's testimony that it was going 25 or 30 miles per hour. This was not in excess of the maximum speed limit and was not in itself negligence. But if Gaines was guilty of negligence, his

negligence was not imputable to plaintiff. Knoxville Railway & Light Co. v. Vangilder, 132 Tenn., 487, 178 S. W., 1117, L. R. A., 1916A, 1111; Nashville, C. & St. L. Ry. v. White, 158 Tenn., 407, 15 S. W. (2d), 1. She testified that she was engaged in conversation with Mr. Bomar on the rear seat with her, and was unaware that they were approaching the intersection. The question whether she was guilty of contributory negligence was one for the jury. Lea et al. v. Gentry, 167 Tenn., 664, 673, 73 S. W. (2d), 170; Shook v. Simmons, 23 Tenn. App., 685, 687. 137 S. W. (2d), 332.

For these reasons we think the learned trial judge properly submitted the case to the jury.

Several of the City's assignments of error are based upon the refusal of the trial judge to charge certain requested instructions. Some of these requests presented the City's theory that it was not liable because the gutter had been constructed according to the plan adopted by the City in the exercise of a governmental function. The learned trial judge in his general charge fairly and accurately submitted this theory to the jury; and it was not error to refuse these requests. Other requests presented the City's insistence that it was not liable because after the gutter had been completed the work was accepted by the City's governing authority and that this amounted to an adoption of the gutter as part of the plan so as to exempt the City from liability. We do not think these requests were accurate statements of the law. What has been said above is a sufficient response to these assignments.

This brings us to the City's assignments that the verdict is excessive and so excessive as to indicate passion, prejudice, and caprice on the part of the jury. As stated, plaintiff suffered a concussion of the brain, fractures of three vertebrae and disturbance of another, and rupture of the liver. She was unconscious for several hours. Dr. Billington was called to see her that night. The next morning he had her taken to Vanderbilt Hospital where she was treated for several weeks. Due to the injury to the liver her abdomen was so swollen that it was not possible to reduce the fractures of the vertebrae for several days. After being treated at the hospital she was taken home and continued to suffer from her broken back and from the injuries to her liver. For a long time she wore a cast, and later a steel jacket and after that a surgical corset. She continued to suffer from the injury to her liver and the swelling of the abdomen until September, 1937, when she was taken to the Protestant Hospital and Dr. Core operated on her, making a large incision all the way down the abdomen. Dr. Core found a scar of approximately 3 or 3½ inches on the surface of the liver, which he said was the result of external violence. This injury caused cirrhosis of the liver, which in turn caused a condition called "ascites." This was a collection of fluid in her abdomen which caused it to swell like a case of full pregnancy. This fluid had to be removed by operations. In all there were some

95 operations and from 8 to 12 quarts of fluid was removed at each operation. The operations were performed by going through the abdominal wall and the peritoneum into the cavity around the liver and draining off the fluid. This condition continued from September 1937 to about September 1939. During all this time plaintiff suffered greatly and part of the time she almost completely lost her mind. Her doctors' bills and hospital bills were over $1,700. All the doctors testified that she was permanently and totally disabled.

At the time of the accident she was 30 years old, in good health, and had regular employment at a salary of $20 per week. At the time of the trial she had been totally disabled for nearly 10 years and the doctors expressed the view that her expectancy was about one-third of what it otherwise would be, and she would remain totally disabled.

What she received for the covenant not to sue does not reduce the liability of the City. Nashville Interurban Ry. v. Gregory, 137 Tenn., 422, 436, 193 S. W., 1053. She is entitled to recover a reasonable compensation from the City for her injuries, pain and suffering, expenses, loss of earnings and also for what it is reasonably certain that she will hereafter suffer as a result of such injuries. The law can furnish no exact measure of such compensation. It must be left primarily to the jury guided by the facts and circumstances and much responsibility rests on the trial judge in determining whether the amount is excessive. After he has approved the verdict it is our duty not to disturb it unless it is evident that he failed to keep the jury within reasonable bounds. This is especially true in this case where the learned trial judge suggested a remittitur to reduce the verdict to the amount he thought proper. This action of the trial judge is entitled to be given much weight by us in considering the question whether the verdict is excessive. Upon all the facts we cannot say that the verdict is so excessive as to justify us in disturbing it.

All of the assignments of error are overruled. The judgment of the Circuit Court is affirmed and judgment will here be entered in favor of plaintiff against the City for the amount of judgment below with interest and also the costs of this appeal in error. Judgment will also be entered against the surety on the appeal bond for the costs of the appeal.

Crownover, P. J., and Howell, J., concur.