OLINS et al. v. SCHOCKETT et al.—215 S. W. (2d) 18.

Eastern Section.   May 13, 1948.

Petition for Certiorari denied by Supreme Court, October 16, 1948.

Sam J. McAllester, Sr. and Sam J. McAllester, Jr., both of Chattanooga, for plaintiffs in error.

Charles A. Noone and Dan M. Byrd, Jr., both of Chattanooga, for defendants in error.

HOWARD, J.   These cases were tried together in the Circuit Court of Hamilton County and involve actions

for personal injuries growing out of an automobile accident which occurred near Cartersville, Georgia, on December 27, 1945, when the automobile in which the injured parties were riding as guests collided with a bakery truck.

Olin Schocket, Fannie Schocket and Lou Schocket will hereinafter be referred to as plaintiffs, and Philip Olins and Jerome Olins as defendants, as they appeared in the trial court.

Fannie Schocket is a sister of the defendant, Phillip Olins, and is the aunt of the other defendant, Jerome Olins, who is the son of Philip Olins and Lizzie Olins. Olin Schocket is the minor son of Lou and Fannie Schocket and the nephew of Philip Olins and a first cousin of Jerome Olins. The Schockets are residents of the State of New York and the Olins are residents of the city of Chattanooga.

The parties have agreed that the Georgia law controls and that a guests cannot recover in an action for personal injuries unless the host driver was at the time of the accident guilty of gross negligence.

Section 68-301 of the Georgia Code regulating the speed of automobiles provides as follows: "Speed Limit. . . . all passenger motor vehicles operated on the public streets and highways of this State and having pneumatic tires are authorized to operate at a speed up to but not exceeding 55 miles per hour."

And Georgia Code, Section 105-203 defines slight diligence and gross neligence in the following words: "In general, slight diligence is that degree of care which every man of common sense, howsoever inattentive he may be, exercise under the same or similar circumstances. Applied to the preservation of property, slight diligence means that care which every man of comman sense, how-

soever inattentive he may be, takes of his own property. The absence of such care is termed gross negligence.''

Each of the declarations charge that the defendant Jerome Olins wrongfully, carelessly and with gross negligence drove his automobile in which plaintiffs were riding as guests at an unlawful, dangerous and excessively high rate of speed, to wit: more than 55 miles per hour; that beause of inattention and failure to keep proper lookout ahead, the defendant drove his automobile from the highway, or permitted it to leave same, which wrongful acts resulted in inflicting serious personal injuries on plaintiffs.

To each of the declarations the defendants interposed pleas of not guilty and filed numerous special pleas in which they denied that Jerome Olins, driver of the automobile, was guilty of gross negligence; denied that he was driving in exess of 55 miles per hour when the accident occurred, and averred that just before the accident occurred he was confronted by an emergency created by an approaching large freight truck followed by a passenger car, both of which encroached upon the west side of the road directly in front of him; that because of an emergency suddenly created, the accident was unavoidable.

A motion for a directed verdict was made on behalf of the defendants at the conclusion of the plaintiffs' evidence and renewed at the conclusion of all the evidence, which motions the trial court overruled.

Upon hearing the evidence the jury returned three separate verdicts against the defendants, as follows: Fannie Schocket for personal injuries, $7,250, Olin Schocket for personal injuries, $1,000; and Lou Schocket for loss of services and medical expenses, $8,000; making a total sum in judgment of $16,250. Defendants seasonably filed

motions for new trials, which motions were overruled by the trial judge, and defendants have appealed in error to this court.

In December, 1945, while Philip Olins and his wife, Lizzie Olins, were in Hot Springs, Arkansas, Fannie Schocket and her minor son, Olin, visited Chattanooga and were guests of Jerome in the Olins home. Lou Schocket, the husband of Fannie Schocket, remained in New York.

On December 27th, Jerome Olins agreed to drive his aunt and his cousin to Atlanta, Georgia, a place to which they had never been, and to which place his aunt wanted to go for historical reasons, principally because she had read the novel "Gone With the Wind" and wished to see Atlanta.

On the aforesaid date, Jerome, driving his father's one-seated Ford coupe (the family purpose doctrine was admitted by stipulation) and accompanied by his guests left Chattanooga for Atlanta about 9:00 o'clock a. m. They first drove to the Jeanette Hosiery Mill located on Williams Street in the city of Chattanooga, where the defendant performed some chores which took about 20 minutes. Thereafter they left Chattanooga and drove to Calhoun, Georgia, where they stopped for the second time for 20 or 30 minutes for refreshments.

The accident occurred at 11:15 a. m., 69 miles south of Chattanooga and six miles north of Cartersville, Georgia, on Highway 41 at a point 70 feet south of the Bearden home, which witnesses have described as being located on the east side of the highway across the highway from the Jones Tourist Court. Here the asphalt pavement was 19 feet wide with a shoulder on the west side of the road six to eight feet wide between the pavement and the ditch.

Made of packed dirt and covered with gravel, the shoulder was used by parked automobiles and pedestrians traveling the highway. Between the west edge of the pavement and the shoulder of the road, there was a slight depression or rut, one or two inches deep, and on the west side of the shoulder the ditch was two to three feet deep.

Beginning at a point near Bell's Store which is located about 900 feet north of the Bearden home, the highway was straight for approximately one-half mile with nothing to obstruct the vision of the driver of an automobile. Upon entering the straight stretch of highway at Bell's Store, the defendant saw near the Bearden home traveling toward him on the east side of the highway at about two miles an hour a mule and wagon owned and driven by Oscar Canty. However, the defendant did not see an approaching northbound freight truck and passenger car overtaking the Canty wagon until the two vehicles were in the act of passing the wagon, at which time the defendant insisted they encroached upon the west side of the road in front of him, forcing him to drive the two right wheels of his car onto the right shoulder of the road in order to avoid a head-on collision with the truck.

Defendant after passing the northbound truck and automobile returned to the paved portion of the highway, where his car barely missed striking the Canty wagon, whose right wheels were near the east shoulder of the road. To avoid a collision with the wagon, defendant pulled his car to the right, causing all four wheels to go completely off the pavement onto the right shoulder of the road where it continued for a distance of approximately 100 feet. He then drove to the left and diagonally across to the east side of the road where the front of his car struck an approaching northbound bakery truck at or

near its left front wheel, knocking the truck completely off the highway for a distance of 17 feet. The impact of the collision knocked the right door of the defendant's car open and the two plaintiffs, as well as the defendant, were thrown from the car onto the pavement and shoulder of the road, thereby causing serious personal injuries to plaintiffs. Thereafter, defendant's car turned around two or three times, re-crossed the road to the west side where it stopped in a field just off the right shoulder of the road. We shall further on in this opinion discuss more fully the extent of plaintiffs' injuries.

From the point where the defendant's automobile first left the pavement to where it barely missed striking the Canty wagon was 60 feet, and from the Canty wagon to where it collided with the northbound bakery truck was approximately 145 feet, making a total of more than 200 feet from where defendant's automobile first lift the pavement to where the accident occurred.

By assignments Nos. 1, 2, 3, 6 and 7, defendants have insisted there was no evidence to support the verdict; that the verdict was against the greater weight of the evidence; that the verdict was contrary to the law; that the trial judge erred in refusing to grant motions for directed verdicts at the conclusion of plaintiff's proof and at the conclusion of all the proof.

Attorneys for defendants in their excellently prepared briefs filed in behalf of their clients have admitted that under the Georgia Court decisions the question of gross negligence upon disputed facts is solely a jury question. Inasmuch as the burden of establishing gross negligence as defined by the Georgia Code was upon the plaintiffs, the chief issue before this Court now is whether there was sufficient evidence adduced by the plaintiffs to support the verdicts of the jury.

Olin Schocket, age 11, testified that the speedometer on the automobile in which they were riding was broken and that they had driven several miles from Chattanooga when he asked Jerome how fast they were driving, to which Jerome replied that they were "going 60 to 70 miles per hour", and Jerome said he knew how fast he was driving from experience. Mrs. Schocket also testified that Jerome said he was driving at above rate of speed and that before reaching Dalton, Georgia, she requested him to slow down because they were driving too fast; that she made the request which Jerome complied with, because she had noticed that they were passing several automobiles on the highway. Both plaintiffs testified that after they left Calhoun, Georgia, Mrs. Schocket made a second request for the defendant to check his speed when he made some effort to demostrate free wheeling by pushing the clutch in and letting the car glide; that she told him to save his demostration until he got home. Jerome, also, according to the plaintiffs, complied with the second request.

Defendant denied that Mrs. Schocket ever requested him to slow down; that he ever attempted to demonstrate free wheeling, or that he ever admitted to the plaintiff's that he was driving 60 to 70 miles per hour.

After passing Bell's Store and just before the acident, Olin Schocket described the speed of the car in which they were riding as "flying like an airplane", and both plaintiffs estimated that defendant was driving 70 miles an hour when they met the northbound truck and passenger car, which Mrs. Schocket stated was from 600 to 700 feet north of the Canty wagon; that they passed the two motor vehiles without mishap and that neither of the vehicles caused the wreck in which they were injured; that Jerome made no effort to slow down his speed while on

the pavement or while driving with two right wheels on the shoulder of the road, but instead increased his speed and lost control of the automobile; that just before his car struck the bakery truck, Jerome said: "Watch out, we're going to crash".

Plaintiffs' eye-witnesses, Oscar Canty, driver of the mule and wagon, and Kiney Gibson and Willie Smith, two employees at the Jones Tourist Court, estimated defendant's speed at from 60 to 70 miles an hour, and that his automobile was about 150 feet north of the Canty wagon when the northbound freight truck and passenger car goingfrom 25 to 30 miles an hour passed the wagon.

Defendant testified that when the accident occurred and previously thereto, he was driving only 45 to 50 miles per hour; that when he got within 150 feet of the Canty wagon, the large freight truck and passenger car traveling 40 to 60 miles an hour suddenly pulled out from behind the wagon onto the west side of the road diretly in front of him and that this made it necessary for him to drive onto the right shoulder of the road to avoid a headon collision with the truck; that the shoulder onto which he drove was wet and slick, and his automobile skidded and got out of control; that he accelerated his speed in an effort to regain proper control of his car; and that in turning back onto the pavement, some sharp object at the edge of the pavement caused his front and rear tires to blow out, which, with the slick shoulder, caused him to lose control of his car.

Although denied by the defendant, Garrison Siskin, plaintiff's witness and cousin of all the parties involved testified that the defendant told him soon after the accident that he didn't know how the accident happened, and that he was driving about 70 miles an hour; that the defendant at first made no mention of the northbound truck

forcing him from the pavement or of any tires blowing out, but thereafter stated to the witness that one and then the other of his left tires blew out.

Though the defendant testified that the northbound truck and automobile forced him to drive his automobile from the pavement onto the right shoulder of the road which he insisted was slick and wet, causing his automobile to skid, he admitted he made no attempt to apply his brakes and reduce the speed of his automobile on either occasion while on the pavement, which was dry.

Both plaintiffs, as well as three eye-witnesses, Canty, Gibson and Smith, testified that defendant's automobile did not skid while on the shoulder of the road, and the three named witnesses further testified that the shoulder was damp, but not slick. On this point, plaintiff's evidence is supported further by the testimony of two Georgia Highway Patrolmen, who arrived on the scene within 15 or 20 minutes after the accident occurred, and who immediately thereafter made a complete investigation of the conditions and circumstances of the accident. They testified that the defendant's car tracks showed no evidence of skidding; that the shoulder was damp, but not slick; and when the defendant was asked by the Patrolmen as to what caused the accident, the defendant made no mention of his automobile skidding, nor did he tell the Patrolmen that two of his tires blew out. Defendant also failed to tell either of the Patrolmen that he was forced off the pavement of the road by an approaching truck.

To the defendant's contention that his left front and rear tires blew out, while attempting to get his automobile under control and onto the pavement, none of the above witnesses who were at the scene of the accident or arrived immediately thereafter noticed any flat tires. The two highway patrolmen testified that upon inspection they

found none of defendant's automobile tires were down, but that all of them were up.

Pictures of the highway where the accident occurred were introduced in evidence and they show there was no obstruction to prevent the defendant from seeing the approaching freight truck for a considerable distance before overtaking the Canty wagon. Only neglect on the defendant's part and his failure to have a proper lookout ahead prevented him from seeing the truck before it reached the Canty wagon. On defendant's failure to see the approaching truck, he testified: "Well, I didn't pay any particular attention to it (the freight truck) until the emergency existed; until it pulled around the wagon".

■ Whether the approaching truck and automobile upon passing the Canty wagon created an emergency which confronted the defendant, as he contended, was a controverted fact which the trial judge properly submitted to the jury along with other controverted facts.

■ Under the decisions of the Georgia courts wherein they have construed the gross negligence statute, the courts have held that questions of negligence and diligence, even as to gross negligence and slight diligence, as well as the determination of what constitutes the proximate cause of an injury, and what amounts to a failure to exercise ordinary care on the part of a plaintiff, are generally questions for the jury. Atlantic Ice & Coal Corp,.et al. v. Newlin, 56 Ga. App. 428, 429, 192 S. E. 915; Moore v. Bryan, 52 Ga. App. 272, 183 S. E. 117; Frank v. Horovitz, 52 Ga. App. 651, 183 S. E. 835; Frye v. Pyron, 51 Ga. App. 613, 181 S. E. 142; West v. Rosenberg, 44 Ga. App. 211, 160 S. E. 808; Rosenhoff v. Schaul, 42 Ga. App. 776, 157 S. E. 215; Rowe v. Camp, 45 Ga. App. 794, 165 S. E. 894; Smith v. Hodges, 44 Ga. App. 318, 321,

161 S. E. 284; 5 Am. Jur., Sec. 241, p. 635; 38 Am Jur. (Negligence) Sec. 347.

There was an abundance of evidence that Jerome Olins was immediately prior to the accident driving at a rate of speed of more than 60 miles an hour and the jury was justified in finding that he was driving at a much hingher rate of speed when the accident occurred, since he admitted that he increased his speed while on the shoulder of the road. We are convinced from the evidence that there was no skidding and that there were no blowouts before the accident; that the shoulder of the road was not slick and that if Olins increased his speed as he contended, he was not using ordinary care or common prudence; that if the truck and passenger car forced him off the road, as he insisted, he had the opportunity to regain partial if not complete control of his car and reduce the speed thereof before striking the bakery truck. In failing to do this, he was not exerising that slight degree of care which the average person would exercise in the protection of his property or person. We find ample evidence to support the jury verdicts and the above assignments are accordingly overruled.

By defendants' assignment No. 4, they have insisted that the verdicts of the jury were excessive; that they are so excessive as to show passion, prejudice and caprice on the part of the jury.

Under this assignment, let us consider first the case of Olin Schocket in whose favor a verdict was rendered for the sum of $1,000.

When the collision occured, both plaintiffs were thrown from the car and upon striking the ground were knocked unconscious. Upon regaining consciousness Olin Schocket testified that he was lying on the pavement with a loaf of bread under his head; that some time later, he

was transported to the hospital at Cartersville, Georgia, where he was treated. Two days thereafter, he was transferred to Erlanger Hospital in Chattanooga where he remained for three months under the treatment of doctors. His injuries consisted of a fracture of the right thigh, as well as a fracture of the left wrist. To be treated for his thigh injury, his leg was propped up with two sticks and from his heel there was hung a bag of heavy weights to stretch his leg. Later he was placed in a cast. Upon his return to his home in New York, while taking exercises under the doctor's advise, the fracture of his hip separated and it was necessary to put a pin through his heel so that the stretching with the weights could be done again. The weights were kept on his leg for three weeks during the last treatment. His leg is now shorter than the other one and he is compelled to wear a shoe with a thick sole to make up for the shortage, and the doctors testify that this injury is of a permanent nature. He testified that before he was injured, he enjoyed good health and took part in the usual activities of boys his age and that he now suffers pain in his arm and leg on rainy days and during bad weather. He lost a whole session from school and was under the care of doctors in New York for several weeks.

The shortage of this right leg is estimated at from one-half to one inch shorter than the other leg. For two months, wihle he was recovering from the separted fracture, he was compelled to walk with crutches, and the doctors estimate his disability at 25% for the right leg.

We next consider the personal injuries of Mrs. Schocket, age 47 years, for whom a jury verdict was returned for $7,250. Upon being taken by ambulance to the Hospital at Cartersville, Georgia, the medical evidence showed that she had concussion of the brain and

for several hours was unconscious and that it was necessary to give her two blood transfusions; that because of insufficient equipment at the Cartersville Hospital, she was three days later transferred to Erlanger Hospital in Chattanooga, where she remained for three months.

At Erlanger Hospital Dr. Sheridan was called on the case and his testimony was that Mrs. Schocket was in a very serious condition. She was semi-conscious and was suffering from a very severe shock. She had previously received first-aid treatment and her left arm was on a splint. Her abdomen was distended and the doctor found blood in her urine. She was given sedatives and three blood transfusions and because of her several injuries other doctors were called in to treat her and for medical advise.

The medical testimony disclosed that Mrs. Schocket suffered fractures of the nose and of the left collar bone; a fracture of the forearm near the wrist, as well as dislocation of the joint between the two bones of the left forearm; fractures of four ribs on the left side and two ribs on the right side. There was a fracture of the second lumbar vertebra an two fractures of her pubic bone or pelvis, a total of fourteen different fractures.

There was considerable swelling about Mrs. Schocket's eyes. Her left eye was completely closed and the cornea, the clear part of the eye, was cloudy. Dr. Long, eye, ear, nose and throat specialist, was called in to treat the injuries to her nose. He described her condition as follows: "She seemed to be in quite shock and seemed to have multiple breaks in her body, which of course, I didn't go into. I was only interested in the eye, ear, nose and throat, and that part I examined and her face was swollen, she had numerous concusions, lacerations and abrasions about the face, nose, her eyes were then swollen together

and her nose was broken which you could feel by trepidation.''

Because she could not be put to sleep when Dr. Sheridan was ready to set the fracture to her left arm, Dr. McCravey was called in to block the nerve with a local anaesthesia.

Dr. Livingstone described her condition as follows: ''She was gravely ill and it was doubted whether she would be able to make it all all''.

Upon being released from Erlanger Hospital, Mrs. Schocket was taken to her home in New York City, where doctors were called to continue her treatments. For several months after her injuries she was compelled to wear a heavy brace to support her back. This brace was later exchanged for an elastic corset which she wore during the trial.

She has been unable to use her left arm for normal purposes, and cannot lift objects weighing over two or three pounds. Assistance has been required to dress her and she has been unable to do her regular housework. She has a permanent injury of 35 to 50% to her left arm. Because a nerve in her left leg had to be cut, she testified that she was unable to sit comfortably on a chair, and there was a blood clot on the left hip which will require an operation. She testified at the trial that she suffered from headaches continuously because of her nervous condition and that during rainy weather, she suffered extreme pain from the fractures. It is apparent that she suffered great physical pain and much mental anguish because of her injuries.

For doctors' bills, hospital bills and medical expenses, as well as for the loss of services for his wife and son, Lou Schocket received a jury verdict of $8,000, which, in the light of the evidence that he had incurred as ex-

penses the sum of $6,649.93, we do not think was excessive. Defendants adduced no evidence that the medical expenses incurred by Schocket were unreasonable, or that the services of any of the doctors were unnecessary.

Our Appellate Courts have heretofore declared that amounts allowable as compensation for personal injuries are not measured by fixed rules of law, but rests largely in the discretion of the jury, and damages in personal injury cases will not be disturbed on appeal, unless the amounts fixed are so excessive as to indicate passion, prejudice and caprice on the part of the jury. National Funeral Home v. Dalehite, 15 Tenn. App. 482; City of Knoxville v. Camper, 21 Tenn. App. 210, 108 S. W. (2d) 787; Municipal Paving Co., etc. v. Hunt, 22 Tenn. App. 380, 123 S. W. (2d) 843; City of Nashville v. Brown, 25 Tenn. App. 340, 157 S. W. (2d) 612; Town of Clinton v. Davis, 27 Tenn. App. 29; 177 S. W. (2d) 848; Wolfe et al. v. Vaughn, 177 Tenn. 678, 152 S. W. (2d) 631.

Taking into consideration the extent of the injuries incurred by both plaintiffs and the suffering occasioned by them and the duration thereof, we do not believe that the verdicts are excessive and we have found no indication of passion, prejudice or caprice on the part of the jury.

Inasmuch as defendants did not plead specially that plaintiffs were guilty of contributory negligence as is required under Code Section 8767, we have not considered the fifth assignment of error. Hammett v. Vogue et al., 179 Tenn. 284, 165 S. W. (2d) 577.

The eighth assignment of error is based upon the refusal of the trial judge to grant a new trial because of the alleged misconduct of the jury.

Defendants insist that the verdict rendered by the jury was a majority verdict, and not a unanimous verdict;

that an antecedent agreement was made by the members of the jury to abide by a majority verdict of the jurors. This assignment has given us more concern than that of any other since there was considerable discussion in the jury room over abiding by the majority.

After deliberating for more than two hours, one of the jurors suggested to the other members of the jury that a vote be taken on whether they would all agree to be bound by a majority verdict. Thereupon a vote was taken and two of the jurors voted against the proposal and another juror refused to vote. Thereafter an agreement was reached by the jury in all three cases and upon reporting to the Court that they had found verdicts in favor of two of the plaintiffs, Fannie Schocket and Olin Schocket, and against the third plaintiff, Lou Schocket, the Court sent the jury back to the jury room for reconsideration on the proposition that if the two injured parties were entitled to recover, then as a matter of law the husband and father, Lou Schocket, would be entitled to a judgment for loss of services and for medical expenses. Upon being directed to return to the jury room, the Court told the jury to reconsider the entire cases, which was done for some time when the jury came out and requested further instructions. After receiving from the Court the instructions requested, the jury returned to the jury room for further consideration of the cases and finally brought into Court the three verdicts involved herein, and to each of the verdicts as they were announced, the Court asked: "So say you all, gentlemen?", to which there was a unanimous affirmative response by the members of the jury.

At the hearing of the motion for a new trial, juror Ayers testified before the trial judge as follows:

(Record page 472):

"Q. 9 Well, how did the jury vote on the question of majority vote deciding the question of liability? A. You mean as to the count?

"Q. 10 Yes. A. Mr. McAllester, I don't remember, but I think it was either nine to three or ten to two, and I am not sure.

"Q. 11 Now, then, was there ever a unanimous vote of the jury taken or voted on the question of the gross negligence of the defendant? A. No, sir.

"Q. 12 How's that? A. No, sir.

"Q. 13 After the majority vote was taken and the jury agreed to be bound by the majority vote, did you then assess damages? A. Well, there wasn't anything else we could then do but to start arguing about the amount.

"Mr. McAllester: You may ask him."

Cross Examination

By Mr. Noone:

"Q. 1 Mr. Ayers, did you at any time in advance agree to be bound by the majority verdict? A. No, sir."

After several jurors were examined before the trial judge he prepared a memorandum opinion, from which we quote a part as follows: "If the verdicts were majority verdicts they would have to be set aside. I find all jurors did agree to the verdicts returned. The two or three who at first refused to vote with the majority that the defendants were guilty of gross negligence finally did agree with them. The evidence fails to show these two or three jurors agreed to be bound by or adopt the majority rule. I have concluded the verdicts were not majority verdicts."

When two or three of the jurors refused to vote for or voted against the proposal to abide by the de-

cision of the majority, such a proposal never became an antecedent agreement and would not vitiate verdicts properly reached subsequently thereto by the jury. No antecedent agreement having ever been made, those jurors who refused to vote, as well as those who voted against the original proposal, could thereafter properly change their minds and agree with the conclusion properly reached by the majority, and return valid verdicts accordingly.

■ In Knoxville Railway & Light Company v. Rogers, 5 Tenn. Civ. App. 218, at page 222, the Court said: "We have always understood the rule to be that if there was no antecedent agreement to abide by the result, the fact that the jury subsequently agreed upon a quotient verdict will not vitiate their report, especially if after the quotient is ascertained they discuss it and deliberately agree upon the amount thus ascertained." Also Glidewell v. State, 83 Tenn. 133.

We therefore overrule this assignment of error.

Defendants have insisted by assignment No. 9 that the trial judge erred in his charge to the jury that they could consider speed as an element in determining the question of defendant's gross negligence.

The following is that part of the trial judge's charge complained about: "Now, gross negligence, gentlemen of the jury, is more than ordinary negligence. Gross negligence, under the laws of Georgia, is the absence of slight diligence. Now, under the laws of Georgia, the speed is limited to 55 miles per hour, but if you conclude the defendant's auntomobile was being operated at a rate of speed in excess of 55 miles per hour in violation of the law, that in and of itself, nothing else appearing, would not constitute gross negligence, that would not make gross negligence in and of itself, but if you conclude that the

defendant's automobile was being operated at a rate of speed in violation of the law, that is, 55 miles per hour, you would consider that evidence along with all the other evidence in the case, in determining whether or not the defendants were guilty of gross negligence.''

We are of the opinion that the above portion of the trial judge's charge to the jury constituted a very able and considered exposition of the law applicable to guest cases as pronounced by the Georgia courts. Floyd v. Williams, 54 Ga. App. 557, 188 S. E. 467; Moore v. Bryan supra, Longino v. Moore, 53 Ga. App. 674, 187 S. E. 203; Pitcher v. Curtis, 43 Ga. App. 622, 159 S. E. 783; Frye v. Pyron, supra; West v. Rosenberg, supra; Ragsdale v. Love, 50 Ga. App. 900, 178 S. E. 755; 5 Am. Jur., Sec. 243, p. 637.

In Moore v. Bryan, supra [52 Ga. App. 272, 183 S. E. 123], the Georgia court in considering speed as an element of gross negligence said: ''3. Considering the petition with the proffered amendment of May 2, 1935, and bearing in mind the principle that questions of negligence, even of gross negligence and slight diligence, are generally for determination by the jury under appropriate instructions from the court, it appears from the petition that on a dark night the resident defendant Bryan was driving at an excessive, dangerous, and unlawful rate of speed, about 65 to 70 miles an hour, and did not have his automobile under control; that by operating his automobile at a less rate of speed he could have avoided the collision with Byck's automobile, the highway at the point of the collision being straight and without obstruction; and that the plaintiff protested to Bryan about his excessive and dangerous speed, and Bryan paid no heed thereto; and it is alleged that had he done so, he could have avoided the collision and thus prevented the subsequent injury.''

■ Finally, we think there is no merit in defendants' assignments 10 and 11, which are based upon the trial judge's charge to the jury wherein he inadvertently and mistakenly referred to Philip Olins as the driver of the automobile when he clearly meant Jerome Olins. These were harmless errors and were not prejudical to defendants. Tally v. Dalton, 10 Tenn. App. 597; 53 Am. Jur., Sec. 556, p. 442; 64 C. J., 574, p. 634.

We have carefully and paintakingly read the entire record with special attention to the assignments of error, and finding no error which would justify a reversal of the cases, all assignments of error are overruled and the judgements below will be affirmed at defendants' costs.